IDAHO, The (HENTZ v.). See Case No. 6,-997.

## Case No. 6,999.

### The IDA L. HOWARD.

[1 Lowell, 2; [1] 27 Law Rep. 257.]

District Court, D. Massachusetts. May, 1865.

SALVAGE — DERELICT — CONSUMPTION OF SHIP'S STORES BY SALVORS—COMPENSATION.

1. Salvors of a derelict vessel have the right to retain possession until the salvage service is completed.

[Cited in The Cairnsmore, 20 Fed. 522.]

2. But if their own means are inadequate they are bound to accept additional assistance, if offered.

[See The Amethyst, Case No. 330.]

3. If, in such case, a steamer furnished by underwriters is offered the salvors free of charge, they cannot found a claim to increased compensation upon their acceptance and use of the steamer.

4. The use and consumption by salvors, in the course of their service, and for their necessary subsistence, of stores found on board a derelict, is proper, although they could have brought stores of their own on board without great inconvenience.

5. Salvage of derelict property is compensated by similar rules as obtain in respect to property not derelict. If the abandoned vessel lies in or near a frequented harbor, the chief ground of enhancement of salvage by reason of her being derelict is that the finders have all the responsibility of the enterprise without aid from the master.

[Cited in The Hyderabad, 11 Fed. 755.]

6. Where numerous salvors of a derelict vessel and cargo, stranded in Boston harbor, labored diligently during more than one day, and furnished lighters, and aided materially in the salvage, which however, would not probably have been successful but for the services of a steamer and some other appliances furnished them by the underwriters, they were allowed $2000 and expenses as salvage on a value of $12,000 saved.

---

[1] [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

In admiralty.

On the 15th of February, 1865, the schooner Ida L. Howard, of about one hundred and sixteen tons burden, owned in Portland, and bound on a voyage thence to Philadelphia, with a cargo consisting chiefly of barley in bulk, attempted to make the harbor of Boston to avoid an impending storm. At about eleven o'clock at night, while holding her course, as her master supposed, towards the harbor, she struck on what are known as the "Egg Rocks," near Boston light. After staying by her for some two hours, and about an hour before high water, the sea making fast, and the schooner being in imminent danger of going to pieces, the master and crew all left her in their only boat, taking with them most of their clothes and personal effects, and such other light articles of value as they had on board, and finding no safe landing at any nearer place, there being much ice floating in the bay, rowed to Boston, where they arrived at about eight o'clock the next morning, the 16th.

In the mean time the vessel had driven off or over the ledge on which she had originally struck, and had gone over to Point Allerton, about a mile distant, in a southerly direction, where she was stranded, on a rocky beach, going on apparently at or near high water, and was found by the libellants between seven and eight o'clock in the morning, hard aground, and somewhat heeled over to starboard. The libellants, thirty-six in number, were all inhabitants of Hull, and several of them experienced wreckers. They waded on board, through water and floating ice about three feet deep at the bow, the tide being ebb and within about an hour of low tide, and found that the schooner had all sails set, of which the main topsail and flying jib were considerably torn; that she was about one-third full of water, and that both pumps were frozen up. The libellants immediately took energetic and skilful measures for the relief of the vessel. They hauled down and made fast the sails, and thawed out the pumps. They sent to Hull, about a mile and a half distant, for an anchor, which was brought round by a small schooner belonging to the libellants. This anchor and two belonging to the Howard were carried out through the surf, with a good deal of difficulty and some risk, and hauled taut; and a steam tug-boat, the Dayspring, was telegraphed for to Boston, and came down, arriving some time before high water.

At high tide, in the afternoon, by heaving on the anchors, and with the aid of the tug, the libellants got the stern of the vessel round directly to seaward, and tried to push her off the beach, but failed, the tug parting two hawsers, and the schooner moving but slightly. During the morning the wind had moderated, and again

increased, blowing a whole sail breeze from the eastward, and the sea was very rough. In the afternoon the wind hauled to the northward, and moderated again, and so continued until the vessel was got off the next afternoon, and the sea gradually went down. In the forenoon, and some hours before this attempt was made to get the schooner off, her master came down, and being unable, as he testified, to go on board by reason of the surf, had a conversation with some of the libellants, who were in the little schooner Laurel, which had brought the anchor round from Hull. He told them who he was, inquired into the condition of the vessel, said he had not come to interfere with them, but that they were to go on and get the vessel off, and should be well paid if they succeeded, and asked where they should convey her if they got her afloat. The master then went back to Boston. A few of the libellants remained on board all night. Others came back with their schooner Thetis, after the tide had risen that night, and began lightening the vessel by taking off the deck-load, which consisted of eight wooden hay-presses, in pieces—a full deck-load. This work was continued by the Thetis, assisted afterwards by the schooner Malcom, belonging to the libellants, until the whole deck-load had been got off, which was not long before high tide in the afternoon. The libellants also carried out a fourth anchor. At an hour or an hour and a half before high tide, the Dayspring came down again from Boston, at the request of the libellants, to aid in the second attempt to pull the schooner off the beach.

At some time on the 16th of February, the underwriters of the cargo heard of the disaster, and engaged Mr. Tower, who is agent of the New York and Boston underwriters, and a commissioner of wrecks under the laws of Massachusetts, to look after the matter. The president of the office gave Mr. Tower a letter giving him charge, as he expressed it. He engaged the steam-tug Starbuck, and a schooner with cables, &c., often employed by the underwriters, and early the next morning went down in the tug, and going as near the wreck as was prudent, had a conversation with one of the leading salvors, master of the Thetis, found that the barley was in bulk, and that the salvors had no bags, and went back to Boston for shovels and bags, and some other tools and implements which he thought necessary, and which he procured, and left Boston again some time after noon, and, in going down, overtook the master of the Howard with a mate and one man rowing towards the wreck, took them in tow and arrived there soon after the Dayspring, that is, an hour or more before high water. How many men came with Mr. Tower did not appear. From this point there was some little difference in the testimony, and a

good deal in the legal inferences sought to be drawn from it on either side.

Either the master or Mr. Tower, or both, told the salvors that they had come with additional means and assistance, and demanded the right to discharge a part of the cargo, and to take the direction of affairs. The libellants refused to give up the charge of the vessel and to receive the assistance, except on terms. They offered to hire Mr. Tower and his men, which offer was indignantly refused. They at first declared that the tug Starbuck should not assist; but soon after, and before high tide, made a bargain with her master for her assistance upon terms agreed between them. The Starbuck and Dayspring made fast to the wreck, the libellants heaved on the anchors, and the vessel was hauled off the beach after an hour of severe labor. The tugs took the saved schooner, the salvors' schooners, Thetis and Malcom with the hay-presses on board, and the underwriters' schooner Kate in tow, and all proceeded together to Boston, where the Howard was safely moored and delivered to her master. An anchor and some chain cable, which was thrown over at the last moment, to lighten the vessel, were recovered by the libellants, and delivered on board of her the next day, and on that day, the parties being unable to agree on the amount of salvage, this libel was filed.

J. C. Park & J. M. F. Howard, for libellants, insisted that the schooner was derelict, and that the salvors were entitled to a moiety of the value saved.

F. C. Loring & J. Lathrop, for claimants.

LOWELL, District Judge. Salvors, strictly so called, are persons who undertake to save property in peril, at the request of the owners, or of their agent, the master; and if any definite contract is made, in any case, freely and fairly, they are bound by its terms. But if no bargain is made, still the salvors are under the direction and control of the master, and may be discharged by him, with or without good cause, upon being compensated for what they have already done, or without such immediate compensation, if their lien is not endangered. Finders, on the other hand, take possession, primarily by right of discovery, and cannot be dispossessed afterwards by the owner or master. Again, finders being in possession under no contract, may, I suppose, abandon their enterprise at any time before other persons, either salvors or owners, who might have saved the property, if they had not, have intervened, or been ready to intervene; in other words, if their exertions have not diminished the chances of ultimate safety; and this without waiting for any such danger to life, or apparent hopelessness of the enterprise, as would alone justify salvors in such abandonment. On the other hand, both salvors

and finders are under an implied obligation to use good faith, honesty, skill and energy in what they do undertake. Their services are, at the present day, compensated upon principles substantially similar, and diminished or forfeited alike by want of due care and skill, or by positive malfeasance. I cannot, therefore, assent to the argument for the libellants, that if this is a case of derelict goods, the salvage compensation should be a moiety, or some definite proportion approaching a moiety of the value of the thing saved. Post v. Jones, 19 How. [60 U. S.] 150. The compensation, when we come to it, must be given on the general principles of salvage, with this element of merit, that the salvors have not, in a case of derelict or quasi derelict property, and had not in this case, the advantage and relief of the oversight and direction of the master of the vessel, who is presumed to be the most competent person, and the person most deeply interested in the proper direction of affairs, in such a calamity; and as oversight and responsibility are more highly paid than mere labor, their compensation should be enhanced accordingly.

When an abandoned vessel is found floating at large on the high seas, there is, of course, the consideration which, I apprehend, is at the foundation of much that has been said on the subject of derelict, that so far as any beneficial property of the owner is concerned, it is in the utmost peril; nearly as much so when it happens to turn out tolerably seaworthy, as if it were in very bad order, because, in any event, the chance of recovery must be very slight. But this does not apply to a wreck in the harbor of a town like Boston, where vessels are constantly passing and succor is always to be had. A fact which depends upon intent is often difficult to establish or to disprove. In this case, the master left his vessel to save the lives of the persons on board, at a time and under circumstances which render it doubtful whether he knew precisely where he was or could estimate very accurately his peril; he took with him, apparently, whatever was most valuable and portable. He went to Boston and noted a protest which has not been produced; he went down again, without his officers or crew, so far as appears, and without any means or intention to aid in the rescue of the valuable property which had been intrusted to him; he was afraid to go on board his vessel, for the surf; he told the salvors to go on and get the vessel off, and went back to Boston. It is disputed, and is almost the only fact that is disputed, whether he told the salvors that he thought he should go home to Portland; three witnesses swear that he did. He denies it. However this may be, it is clear that he might as well have been in Portland, for all the aid he gave by coun-,

sel or by act in saving the vessel and cargo at that time. His part of the affair appears to have been that of a disinterested spectator; surely a very singular position for the master of a vessel who had not abandoned her. There are two cases in which the abandonment was made under circumstances like those of the case at bar, and where the master's right was much stronger than in this, in which it was held that the salvors had a right to treat the property as derelict. The Sarah Bell, 4 Notes Cas. 147; The John Gilpin [Case No. 7,345].

Taking all the facts of the abandonment, and of the conduct of the master afterwards, I think the salvors' right of possession on the second day was superior to his.

It is said, that, whatever may have been the rights of the master, Mr. Tower, the commissioner of wrecks, had, by a statute of this state, the right of possession, whenever he chose to assert it; and I was urged to give a construction to this statute, which is said to be understood somewhat differently by the wreckers and the commissioner respectively. The present case, however, calls for no decision on this point, because Mr. Tower's evidence is very distinct, that he made no demand and assumed no authority as commissioner of wrecks. His office was well known to the wreckers, but for some reason, no doubt sufficient, he did not choose to assert it. He is agent of the underwriters as well as commissioner, and in the former character had a letter from the underwriters of the cargo which had not been abandoned, "giving him charge" of the property; but it is very clear, that neither those underwriters nor their agent could take charge of this wreck against the wishes of the salvors. But it is not, perhaps, necessary to rest the decision of this point solely on this ground. It is by no means entirely clear to my mind that the salvors understood that the demand of possession was made distinctly by the master, as master. He was there with Mr. Tower, and accidentally, so far as time is concerned; for, if Mr. Tower had not taken him in tow, he could hardly have arrived much before high water. Mr. Tower conducted the negotiations, and by his character, and by his having charge of the second tug and other appliances, though not by his official position, was the principal person; he showed the salvors his letter, he says, and reasoned with them. I am not clear that the salvors did not understand the demand, which they refused, to be that of the agent of the underwriters. The master's chief complaint, on this head, in his deposition, is, that they would not obey the agent; the agent, on the stand, appears to consider the master the person most aggrieved.

But whatever may have been the right of possession and control, the salvors were bound to accept the assistance offered them, if it was necessary to the ultimate success

of the enterprise, or would hasten that result in any material degree, as by saving a tide or the like. Upon this point, the libellants appear to have misunderstood their position. It was their duty to accept necessary assistance, even if offered by strangers; and they would reject it at their peril. If they could make no bargain for their aid, they must accept it without a bargain, and leave the owner or the court to adjust their compensation. Here it is evident that some part of the assistance offered by Mr. Tower was necessary. The event has shown that without the services of the Starbuck the vessel could not have been saved, at that tide, unless a part of her barley had been discharged, which the salvors could not do themselves, and refused to let Mr. Tower do. It is plain, on the evidence, that it required all the power of both tugs, working under a high pressure of steam, and even the jettison of an anchor and chain, to get her off, at the last moment that the tide remained sufficiently favorable. I cannot therefore justify the refusal of the libellants to accept her services. But they had an opportunity of repentance, and improved it; they engaged the services of the Starbuck, after a short delay, and by so doing saved the tide and their salvage. I am not curious to inquire whether their hesitation lasted for five minutes or for twenty-five; as the owners did not suffer by it, neither should the salvors. But, on the other hand, I do not think that the compensation of the salvors should be increased by their hiring the Starbuck, whose services were offered them, without charge by the underwriters. They were bound to accept those services, as I have already said, even if offered by strangers, leaving the salvage to be settled afterwards; but here was no question of salvage. Persons interested in the property tendered the gratuitous services of the tug. How then are the salvors to wait until they can make a bargain for what they were offered without price, and then adduce those services as something added to their own merit and "procured" by them, as they say in their libel? The Starbuck was not procured by them; and the question of their compensation must stand as if they had accepted her at once, as a salvor, if such had been her character, or as the underwriters' vessel, if such she were. In other words, the underwriters are entitled to the benefit of their own exertions and foresight; and the salvors are not to be paid for a foresight which they did not exhibit.

It remains to fix the compensation justly due to the libellants, a matter much more difficult than to ascertain either the facts or the law of this case, because it is one which has and can have no fixed scale of prices, and of which the principles, though well understood, are very general and difficult to reduce to computations. I take off nothing for the alleged embezzlement of

clothing and provisions; because, resting solely on the evidence of the master, and that given some time after his first deposition was taken, and weighed by all the facts and evidence, I do not think the allegation is made out, except to this extent, that the salvors did make use of some of the vessel's stores and provisions, without plunder or waste. I am asked to say that such use is unlawful; and a brief note of a case before Judge Marvin, and found in his excellent work on Wreck and Salvage (section 105), is relied on. I have no doubt that decision was right; but as the case is not stated at all, it cannot be compared with this or any other case, and must be taken to have been decided upon its own circumstances, or upon some rule found to be necessary for the Florida wreckers, who form a distinct class or trade. It cannot be maintained, as a general proposition, that salvors are bound to find their own supplies, pending the salvage service. On the contrary, supplies so furnished, if of sufficient importance to be considered at all, form one of the items of the expenses which are to be refunded to the salvors. In this very case, if the libellants, some of whom staid by the vessel, continuously for two days. had brought their supplies from Hull, and carried them out to the vessel through the surf which the master was afraid to encounter, that fact would have been a proper one for compensation. It is rather for the advantage of the vessel that her stores were available for the purpose, and her owners can adjust the cost with any others who may be responsible to contribute, as readily in the one case as in the other.

I am satisfied, not only by the opinions of the libellants and their neighbors, but from a consideration of the state of the vessel with all her sails set, her position on the rocky beach, the amount and direction of the wind and surf, and the damage that she actually sustained, that she was in imminent danger of bilging when found by the libellants; and I think her safety from that peril is owing to their exertions. If she had bilged, the vessel and cargo would have been much more damaged than they were, if not destroyed. Besides this, the exertions of the salvors in pumping the vessel constantly, or as much as was necessary, in carrying out anchors through a surf which the master dared not enter, in removing the deck-load by night and day on board their own vessels furnished for the purpose, hauling on the anchors, and engaging the Dayspring, were energetic, meritorious, skillful, and well-directed services, and performed for the most part without the aid or advice of the master or any one else. These services have secured to the owners and underwriters a great part or all of a property valued at twelve thousand dollars; and though not completely successful, and not likely to have been completely successful at

that time without the aid of a second tug, yet they were essential, and the principal services in the salvage, and were continued for a long time, with some hazard in carrying out the anchors, with some exposure in wading on board, and by a large number of persons, most of whom, certainly, took an active and useful part.

As they are not entitled to credit for the Starbuck, I allow them one-sixth part, or two thousand dollars, and the money paid for tugs two hundred and seventy dollars. in all two thousand two hundred and seventy dollars. As it was said that the libellants were entirely agreed or could agree upon the division among themselves, and as their relations to each other are not such that any of them appear to need the protection of the court, no order is made upon that subject.

Decree for $2270 salvage.