James CRAWFORD, for himself and for Deuel (Hap) Veerkamp, Plaintiff,

v.

WEST INDIA CARRIERS, INC., a corporation, Defendant.

HASAM REALTY CORP., a Delaware corporation, Plaintiff,

v.

TUG EL MULO GRANDE, her engines, etc., Twenty Grand Offshore, Inc., a Louisiana corporation, Nonpropelled WISCO RANGER, her tackle, etc., West India Carriers, Inc., a Florida corporation, Defendants.

Complaint of TWENTY GRAND OFFSHORE, INC., Plaintiff, Owner of TUG EL MULO GRANDE, Official No. 505240, in an action for exoneration from or limitation of liability, Plaintiff-Petitioner.

Nos. 70–231–Civ.–CF, 70–342–Civ.–CF and 70–591–Civ.–CF.

United States District Court, S. D. Florida.

Nov. 30, 1971.

See also, D.C., 328 F.Supp. 1385.

Richard Ralph, of Ralph & Boyd, Miami, Fla., for West India Carriers.

Morton Good, of Smathers & Thompson, Miami, Fla., for Twenty Grand Offshore.

George E. Patterson, Jr., Miami, Fla., for the intervenor, Dade Drydock.

Fowler, White, Humkey, Burnett, Hurley & Banick, Miami, Fla., for Hasam Realty Corp.

Ehrich & Zuckerman, Miami, Fla., for the salvors, Crawford and Veerkamp.

## MEMORANDUM OPINION

FULTON, Chief Judge.

Captioned causes are within the admiralty and maritime jurisdiction of this Court. Although separately filed, they were consolidated for trial. After receiving and carefully considering all of the evidence adduced in the consolidated trial, the Court enters this memorandum opinion in lieu of particular Findings of Fact and Conclusions of Law, as required by Rule 52 of the Federal Rules of Civil Procedure.

## SAGA OF THE SEA

About ten o'clock on the evening of October 30, 1969, the tug El Mulo Grande, owned and operated by Twenty Grand Offshore, Inc., was towing the barge Wisco Ranger, owned by States Marine Lines, Inc. and bareboat chartered to West India Carriers, Inc., on the northbound leg of a voyage from the Port of Palm Beach to Puerto Rico and return, the voyage having originated at the Port of Palm Beach on October 17, 1969.

While so proceeding, about four miles off the east coast of Florida in the vicinity of Hollywood, Florida, the tow and barge encountered heavy winds and seas, but not so severe as to be unusual or unexpected for that time of the year. At that time and place, the tow cable parted and the barge which was unmanned and without self propulsion or steering equipment was carried shoreward by prevailing winds and seas, until it drifted into shallow water in front of the Diplomat Hotel and Country Club.

The hotel facility was owned and operated by Hasam Realty Corporation. After the tow cable separated, the tug brought its end of the cable aboard and its crew searched for and located the barge, which by that time was in such shallow water that it could not be taken into tow. During the night, while wallowing in the shallow water in front of the hotel, the barge came in contact with three of the hotel's beach groins which extended easterly into the Atlantic Ocean from the beach, with the result that both the barge and the groins were substantially damaged.

While thus imperiled, the barge was boarded by Crawford and Veerkamp who activated the hydraulic pumping system, turned some valves and dropped the port anchor in an effort to ground and immobilize the barge. The next afternoon the crew of the tug, assisted by a marine surveyor and professional salvors, were able to take the barge in tow and remove her from the shallow water to safety at Port Everglades, Florida. The events just related gave rise to captioned litigation.

## THE PARTIES AND ISSUES

For brevity, the parties will hereinafter be referred to as follows:

TWENTY GRAND OFFSHORE, INC., as "TWENTY GRAND"

WEST INDIA CARRIERS, INC., as "CARRIERS"

CRAWFORD AND VEERKAMP as "SALVORS"

HASAM REALTY CORP. as "HASAM"

EL MULO GRANDE as "THE TUG"

WISCO RANGER as "THE BARGE"

Although each of the causes will be dealt with separately and more exhaustively, at this juncture each cause will be briefly described.

70–231–Civ–CF was instituted by Crawford and Veerkamp against Carriers, claiming that they were salvors, who had rendered services in protecting the barge from greater damage. In this cause, Carriers counter-claimed contending that their efforts did not benefit the barge but caused damage.

In 70–342–Civ–CF, Hasam sought recovery against Twenty Grand and Carriers for damage to the groins. Carriers counter-claimed contending that Crawford was an employee of and was acting for and in behalf of Hasam when he boarded the barge and damaged it.

70–591–Civ–CF is an action instituted by Twenty Grand seeking exoneration from or limitation of liability. In this proceeding, Carriers asserted a claim for damages to the barge and Hasam asserted a claim for damage to the groins; and Carriers sought indemnity from Twenty Grand upon the claims of Hasam and the Salvors.

In addition to the foregoing, Dade Drydock Corporation filed a claim against Twenty Grand claiming that, several days after the casualty, the tug negligently maneuvered the barge in a way to cause the barge to strike and damage a syncrolift of the drydock. Happily, the issues thereby presented need not be considered because that claim has recently been compromised and settled by the parties.

## TRIAL PROCEDURE

When the causes were called for trial, counsel jointly announced that they had agreed and stipulated that the total of all of the claims could not exceed the value of the tug, or a fund substituted therefor, and that so much of the petition of Twenty Grand as sought limitation was then moot.

Thereupon, counsel for Twenty Grand urged that the issue which the petition presented for exoneration was nothing more than a denial by Twenty Grand of liability upon the claims which had been asserted and that Twenty Grand should be relieved of the burden of going forward with the evidence and should be permitted to withhold the presentation of its evidence until after the claimants had proceeded, to which the claimants took violent exception.

Prior to the trial, the consolidated cases were jointly pretried on several occasions, exhaustively. A format was developed for the trial whereby Twenty Grand as petitioner would proceed with its evidence and claimants would follow, as is the usual sequence for such cases in this Court. It appeared that counsel had arranged for the attendance of witnesses and otherwise planned for the trial on a basis of Twenty Grand going forward, and it was urged that a last minute change in the sequence would result in some delay of the trial and inconvenience to claimants.

The Court abided the trial format, as developed at the pretrial conferences, and required Twenty Grand to proceed first. The order of presentation of evidence was completely inconsequential because the case was tried very informally, with witnesses being taken out of order for the convenience of counsel, and with each party being afforded a full opportunity to be heard. The rulings set forth in this memorandum opinion would be the same regardless of the order of the presentation of evidence.

## THE SALVAGE CLAIM

The claim for salvage will be dealt with first. This claim was instituted by Crawford for himself and for the use and benefit of Veerkamp. At the trial, the claim was amended to give Veerkamp the status of a co-plaintiff. In defense of the salvage claim, Carriers contend that the efforts of the Salvors did not contribute to the preservation of the barge nor in any way deliver it, even partially, from its perilous predicament. On the other hand, Carriers claim that by unskillfully activating the barge's pumping system and turning various valves, the Salvors caused sand and shell to be sucked into the pump and sea chest strainers, thereby clogging and damaging the same, for which damage Carriers counter-claimed. In addition, Carriers sought indemnity from Twenty Grand for any liability to Crawford and Veerkamp as a result of the claim for salvage.

Crawford was the resident engineer of the Diplomat Hotel. About eleven o'clock on the evening of October 30, he was advised that a vessel was adrift east of the hotel property. At that time it was raining and there was considerable wave action in the surf. Although visibility was limited, Crawford testified that he was able to see the barge in shallow water in front of the hotel. Crawford immediately called the president and general manager of Hasam, both of whom came and were present at the scene. When first observed, the barge was mistakenly thought to be a tanker. Crawford and the hotel officers were apprehensive that oil would be spilled upon the hotel property. The City Fire Department and the City Manager were contacted and advised of the presence and the peril of the vessel, and a request was made for assistance.

In front of the hotel there was a system of four groins which Hasam had constructed from the upland into the ocean, to accumulate sand and maintain a beach. During the trial, and in this opinion, these four groins were and are identified and referred to by consecutive numbers, 1 through 4, with the most northerly groin being No. 1 and the most southerly groin being No. 4. Each groin extends from the beach easterly into the ocean for a distance of 200 feet. The groins are approximately 250 feet apart and each is about one and one half feet in width. The groins were constructed of a series of regularly spaced greenheart timbers driven into the floor of the ocean and held in place by steel interlocked sheeting, which was also driven into the sea bed, all of which was secured by bolted wooden timbers called whalers. The tops of these groins extended above the level of the water.

When the barge was first sighted by Crawford, it was in contact with groin No. 1. Crawford testified that within an hour he observed that the barge had moved upon groin No. 2 and was approaching groin No. 3. He described the course of the barge as being southwesterly. At this time, with Hasam's president and general manager observing, Crawford and a reservations manager of the hotel, whose identity was not revealed, were able to crawl along groin No. 3 to the side of the barge and to board her, by use of a rope ladder provided by the City Fire Department.

After investigating the decks and certain compartments, Crawford was able to activate the generator and turn on the lights of the barge, from stem to stern. Shortly thereafter, the reservations manager disappeared, presumably having returned to shore, unnoticed by Crawford. Crawford testified that the stern of the vessel was then over groin No. 3 and that the barge was not then moving, except that the bow was swinging slightly from east to west with the wave action. Believing that the vessel was grounded, Crawford departed the barge and made his way back to shore. He testified that he was exhausted by the ordeal and that he went to bed in the hotel and slept until approximately 2:30 a. m., when he was awakened by someone who told him the barge was again adrift.

At this point, Veerkamp, who was a reporter for a local newspaper, agreed to accompany Crawford in reboarding the

barge. After they were aboard, Veerkamp found a crowbar, or some similar device, with which a hatch was pried open and entry was made into the compartment which housed the hydraulic pumping gear of the barge. Within this compartment, Crawford found a manual for the operation of the pumping system. He testified that by use of the operational manual he was able to start the pump and open valves; and that salt water was pumped into the stern ballast tanks and that the stern of the barge was thereby grounded. He testified that then, by the use of the same hydraulic power, he was able to lower the port anchor and immobilize the bow of the vessel. The testimony of Veerkamp with respect to these operations was substantially the same as that of Crawford. Unlike Crawford, Veerkamp was very modest and personable. His testimony was free from exaggeration and he was found to be entirely credible.

Apparently, Veerkamp had a deadline at the newspaper for a news article. He departed and went ashore for that purpose. Crawford remained aboard until sometime that afternoon, when the barge was taken in tow by the El Mulo Grande for removal to Port Everglades. Crawford, who obviously had the facilities of the hotel at his disposal, was able to produce at the trial a motion picture of the barge as she laid in the surf in front of the hotel. He also produced a series of still photographs which were taken over a period of hours. By happenstance, the movie and the stills showed Crawford on the deck of the barge.

In support of their claim the Salvors called an expert witness by the name of Green, who was established as a professional salvor with wide experience. This witness, testifying hypothetically, opined that the barge would have gone upon the beach except for the salvage efforts of Crawford and Veerkamp; and he expressed the opinion that if there had been sufficient waves the barge would have contacted and damaged the seawall which protects the hotel improvements from the ocean.

In defending against the salvage claim, Carriers introduced a marine surveyor by the name of Hallbauer. He arrived at the Diplomat Hotel between 4:30 and 5:00 on the morning of October 31, accompanied by one, Walter Byrd, a professional salvor. Later in the morning Hallbauer and Byrd went to Port Everglades and arranged for the return of the El Mulo Grande. They were present when the El Mulo Grande took the barge into tow. Hallbauer was also present at the drydock at Port Everglades and was one of the parties who surveyed the tug for damage. Hallbauer's first hand familiarity with the condition of the barge as she laid in the shallow water in front of the hotel and with her recapture and her survey at Port Everglades is superior to that of any other witness. The Court regards Hallbauer as a knowledgeable and entirely credible witness and has relied heavily upon his testimony in resolving the salvage claim and other issues before the Court.

Hallbauer testified that at 5 o'clock on the morning of October 31st the tide was low, and that it was high at 11 o'clock that morning. Since the tide changes every six hours, it was high at 11 p. m. on the night before, about the time when the barge was first observed by Crawford. The evidence shows, and the Court finds, that the barge successively contacted and crossed portions of groins Nos. 1, 2 and 3. Because Hallbauer found the barge afloat when he arrived at the hotel between 4:30 and 5 o'clock on the morning of October 31, at a time when the tide was low, it is logical and reasonable to believe, and the Court finds, that the barge never was fast aground, except intermittently when her bottom was over and hung upon one of the groins.

Hallbauer and witness Hartley, the marine superintendent for Carriers, both testified that when Crawford activated the pump a quantity of sand and shell was sucked into the pump and into the sea chest, which rendered the pumping apparatus ineffective to fill the ballast

tanks. An examination of the tanks when the barge was dry docked at Port Everglades several days later revealed that the only tank aboard the vessel which had any appreciable amount of water in it was the No. 4 tank which was kept full of fresh water at all times. This testimony is uncontroverted.

The Court finds that the barge was not ballasted by the pumping operations which were initiated by Crawford and that the dropping of the anchor, with the anchor line vertically extended from the barge to the water, was ineffectual. The Court fully credits the testimony of the witness Hallbauer, who unequivocally testified that the salvage efforts of Crawford and Veerkamp did not prevent the barge from going ashore.

The Court is of the opinion that both Crawford and Veerkamp testified truthfully when they stated that the barge was grounded after they boarded her and while she was over a portion of groin No. 3. At that particular time the movement of the stern of the barge was likely arrested by reason of its bottom being upon a groin. The evidence shows that her bottom was punctured and damaged in several places, obviously by the steel in the groins over which she passed.

Regardless of whether Crawford was motivated by a desire to protect the hotel property, and notwithstanding that his testimony was slanted in the direction of his own interest, his activities and those of Veerkamp on the night in question were commendable and heroic. However, the real issue is whether Crawford and Veerkamp are entitled to a salvage award. The requisites for a salvage award are:

1. There must have been a maritime peril from which the ship could not have been rescued without the salvor's assistance.

2. The salvor's act must have been voluntary, meaning that the salvor must be under no official or legal duty to render assistance, and

3. The efforts of the salvor must be successful in saving, or helping to save, at least a part of the property at risk.

The barge was obviously in peril and Crawford and Veerkamp did act voluntarily, but neither of them is entitled to an award because their efforts did not deliver the barge from peril, nor preserve it from damage, even partially. Gilmore and Black, The Law of Admiralty, 445, and Norris, The Law of Salvage, 148–159, ¶¶88–93, and cases there cited.

Having found that the activities of Crawford and Veerkamp were not successful in saving the barge or helping to save it from damage, the Court further finds and concludes that Crawford and Veerkamp are not entitled to an award and that their salvage claim must be dismissed with prejudice. The Court also finds that there is no evidence to support Carrier's counter-claim against the salvors or Hasam and that said counter-claim should be dismissed with prejudice.

## TOWAGE CONTRACT

At the time of the casualty, the barge was being towed under a towing agreement between Carriers and Twenty Grand. The agreement was executed by West India Shipping Company, Inc., acting as the agent for Carriers. Initially, the liability of Twenty Grand turns on the validity of that portion of the agreement which required Carriers to secure hull and P and I insurance coverage wherein Twenty Grand and the tug would be named as co-insureds and which would provide for waiver of subrogation. That part of the agreement which pertains to this issue reads as follows:

Owner (barge) agrees to procure, pay for and maintain in full force and effect throughout the terms of this agreement, hull and machinery insurance in an amount at least equal to the value of the vessel and full form protection and indemnity insurance with a limited amount of at least $1,000,-000. *Principal (tug) shall be named as an additional insured on all said policies and such policies shall contain*

*a waiver of subrogation in favor of principal.* (Italics supplied by Court.).

Principal (tug) agrees to procure, pay for and maintain in full force and effect throughout the term of this agreement, hull and machinery insurance in an amount at least equal to the value of the barge, and full form protection and indemnity insurance with a limit of at least $1,000,000. Owner (barge), the vessel, its master and crew shall be named as additional assureds in all of said policies and such policies shall contain a waiver of subrogation in favor of owner, the vessel, its master and crew. Proper evidence of such insurance shall be furnished owner.

Counsel have stipulated that Carriers did not comply with this clause, in that it failed to have Twenty Grand or its tug named as an additional insured and it failed to purchase waiver of subrogation against Twenty Grand from its underwriters. It appears, however, that Twenty Grand did comply with its contractual obligation by having Carriers named as an additional insured and by securing waiver of subrogation.

Counsel for the barge has urged that the insurance provision in the towage agreement violates public policy and is void and unenforceable because it exculpates the tug and its owner from the negligence of the tug. Counsel for the tug, on the other hand, claim that this clause is not an exculpatory clause, but is merely an insurance requirement to be favored by public policy and that by breaching the towage agreement the barge should be precluded from recovery against the tug, which would have been fully protected by the insurance and waiver which the barge had contracted to procure.

■ In 1955 the Supreme Court of the United States in Bisso v. Inland Waterways Corporation, 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955), announced a judicial rule based on public policy which invalidated contracts that release towers from all liability for their own negligence.

The creation and application of the *Bisso* rule has two purposes: (1) to discourage negligence by holding wrongdoers responsible for their own negligence, and (2) to protect those in need of services from being "overreached" by those with the power to "drive hard bargains."

The clauses in question in *Bisso* were not insurance clauses. The invalidated Bisso clauses were (1) a provision that towing would be at the "sole risk" of the barge, and (2) that the tug's master, crew and employees would, in the performance of their duties, become "employees" of the barge. Bisso v. Inland Waterways Corp.

The first of these clauses was the kind of towage-at-your-own-risk clause considered by the Court in The Steamer Syracuse, 12 Wall. 167, 20 L.Ed. 382 (1871) and later in [The Wash Gray,] Compania De Navegacion v. Firemen's Fund Ins. Co., 277 U.S. 66, 48 S.Ct. 459, 72 L.Ed. 787 (1928). In *Bisso* the Court considered these two earlier decisions, together with intervening Circuit Court decisions and invalidated the exculpatory clause on a public policy basis.

The second clause in the towage contract under consideration in *Bisso* created a fictitious employment of the tug's master and crew for the barge and was also invalidated. The Court in *Bisso* said:

The second clause in the contract . . likewise cannot be enforced. For if valid, the only effect of that clause would be to shift all liability for negligent towage from the towboat to the vessel being towed, precisely what the first clause attempted to do.

This is true because employees of the towboat do not become employees of a vessel being towed just because a contract says so, when as here the workers are in truth and in fact solely employees of the towboat . . . . The rule against contractual exemption of a towboat from responsibility for its own negligence cannot be defeated by the simple expedient of providing in a contract that all employees of a towboat shall be employees of the towed

vessel when the latter "employment" is purely a fiction. Bisso v. Inland Waterways Corp., 349 U.S. at 94–95, 75 S.Ct. at 635.

A similar employment clause was also considered and invalidated by the Court in Boston Metals Co. v. The S/S Winding Gulf, 349 U.S. 122, 75 S.Ct. 649, 99 L.Ed. 933 (1955).

The fact that in *Bisso* the Court not only held invalid the direct "towage-at-your-own-risk" clause, but also the indirect attempt to exculpate the tug by use of the imputed negligence of an employee route is significant in the case at bar because by doing so the Supreme Court forbade tug owners from doing indirectly what could not be done directly.

 The towage contract in the case at bar is not directly exculpatory. It is an indirect attempt at exculpation. The clauses of the towage agreement between Carriers and Twenty Grand are "insurance clauses." However, the effect thereof is the same as the *Bisso*-invalid clauses. Here, the barge is obligated to not only fully insure itself, but also to immunize the tug against any claims of the barge's insurer by way of subrogation, or by direct action. The cost of this protection for the tug must be borne by the barge owner and an additional premium is of course, payable by the barge for the waiver of subrogation.

The *Bisso* doctrine was reiterated and adhered to by the Supreme Court in its 1963 decision in Dixilyn Drilling Corp. v. Crescent Towing and Salvage Co., 372 U.S. 697, 83 S.Ct. 967, 10 L.Ed.2d 78 (1963), reversing 303 F.2d 237 (5th Cir. 1962). In *Dixilyn*, the towage agreement provided that barge owner would assume all liability for damages arising from towage, including any damage claims made by third parties. The District Court held the tower liable for third party claims, in spite of the contract provision. The Fifth Circuit Court of Appeals reversed, holding that the barge owner had entered into a valid contract to assume liability for losses arising from towage. In reversing the Court of Appeals, the Supreme Court said

> In treating as valid a contract which exempts the tower from liability for its own negligence, the Court of Appeals' holding is squarely in conflict with our holding in Bisso v. Inland Waterways Corp. [349 U.S. 85, 75 S. Ct. 629, 99 L.Ed. 911 (1965)], and Boston Metals Co. v. The Winding Gulf [349 U.S. 122, 75 S.Ct. 649, 99 L.Ed. 933 (1955)] . . . . We adhere to the rule laid down in Bisso and Winding Gulf . . . .

Following *Dixilyn* and *Bisso*, Chief Judge Connally of the Southern District of Texas in Offshore Company v. G & H Offshore Towing Co., 262 F.Supp. 282 (S.D.Texas 1966) declined to hold valid and enforceable a *Bisso*-invalid towage-at-your-own-risk clause. In Judge Connally's case, the towage contract incorporated by reference the exculpatory provisions of the Carriage of Goods by Sea Act, 46 U.S.C. § 1304. Counsel for the tug urged Judge Connally to rule contrary to the *Bisso* line, but he "declined to be the first to overrule the Supreme Court on this question."

Certainly, this Court is in accord with the public policy favoring insurance. A contractual requirement that the barge must purchase insurance to protect itself or cargo owners against loss is not repugnant to the *Bisso* doctrine; but an agreement whereby the barge owner must also insulate the tug from liability to the barge insurer for negligence of the tug is violative of the *Bisso* doctrine.

Counsel for the tug has urged this Court to reconsider its decision in the light of Fluor Western, Inc. v. G & H Offshore Towing Co., 447 F.2d 35 (5th Cir. 1971) aff'g Case No. 70–H–208 (S.D. Texas 1970), and Tenneco Oil Co. v. Tug Tony, 324 F.Supp. 834 (S.D.Texas 1971). This Court is familiar with these decisions but declines to alter its decision, because on close inspection both *Fluor Western* and *Tenneco Oil* are distinguishable from the *Bisso* line.

*Tenneco Oil* involved a suit by a cargo owner against a carrier for loss of cargo.

The Court therein held valid and not contrary to public policy the contract of affreightment provision requiring the cargo owner to procure cargo insurance and purchase a waiver of subrogation from the cargo underwriter. *Tenneco* was, however, a *cargo* case—not a towage case. As Judge Bue so aptly pointed out in his Tenneco opinion:

> Towage contracts which provide for a release from liability have been consistently distinguished from contracts of affreightment and charters which include insurance clauses and the waiver of subrogation rights . . . .

> The distinction between contracts of towage and affreightment is not arbitrary. Conceivably, the *Bisso* rule would apply even to contracts of affreightment if it was found that such contracts which relieved the carrier from liability for its own negligence were dictated by a "monopolistic power" or were products of overreaching. Tenneco Oil Co. v. Tug Tony, 324 F. Supp. at 837.

Fluor Western, Inc. v. G & H Offshore Towing Co., 447 F.2d 35 (5th Cir. 1971) is likewise distinguishable from the *Bisso* line of decisions. First, like *Tenneco Oil*, *Fluor Western* is a cargo loss case—not a tug-tow case. Second, in *Fluor Western*, the cargo insurer was by virtue of subrogation the real party in interest. The insurer brought suit in spite of the fact that it had earlier waived its subrogation rights. *See* also, Pure Oil Co. v. M/V Caribbean, 235 F.Supp. 299, 305 (W.D.La.1964).

Like my distinguished friend and brother judge, Chief Judge Connally, I too decline the urgent invitation to be the first to overrule the Supreme Court's opinion in Bisso v. Inland Waterways Corp., 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955) and subsequent decisions.

### EXONERATION—NEGLIGENCE

■ The claims of Carriers and Hasam and Twenty Grand's petition for exoneration present the issue of whether Twenty Grand and the tug were guilty of negligence which directly and proximately caused damage to the barge and the groins. That issue will be next discussed and resolved in this opinion.

Twenty Grand adduced five witnesses whose testimony bears on this issue of negligence, as follows: (1) Robert Thompson, Twenty Grand's operations manager, who had responsibility for and supervision over the maintenance of the tugs, (2) Harry Wilson, the tug's captain, (3) Larry Rebardie, the tug's mate, (4) Joseph Broussard, the tug's chief engineer, and (5) James Mansfield, a marine surveyor, who represented the cargo carrier and inspected the tug and barge immediately before the flotilla departed for Puerto Rico.

Thompson described and gave the dimensions of the tug, the towing winch and the tow cable. The tow cable was 1800 feet long; it was 1½ inches in diameter; it had a hemp core and was wrapped with six metal ropes, each of which rope is composed of 36 separate wires. The end of the tow cable nearest the barge connected with a nylon rope which was 250 feet in length, called a surge line or snatch line. The surge line has more elasticity than the tow cable; it absorbed the shock caused by a slack cable and from the surging action which developed when the barge was drawn through rough water. The tow cable and the surge line were connected by a device, which was referred to by the witnesses as a socket or thimble.

Thompson testified that when the cable was not in use it was wrapped upon a drum, located on the stern of the tug. According to his testimony, it was the duty of the captain to inspect the cable when it was payed out and retrieved. He said that teach tug is provided with a quantity of oil-graphite compound to be applied to the cable when rust is observed. On occasion the cable is turned end for end for the purpose of compensating for wear or corrosion which is apt to develop on the last 150 feet of the cable, that part most frequently in the water. Thompson stated that the tugs usually return to the home port at Mor-

gan City, Louisiana every six months or so, where the tow cable is given a cursory inspection, unless a closer inspection is specified by the captain, "who has the final say." He testified that if the inspection of the cable reveals undue rust, burrs or broken strands, the cable is replaced. Thompson emphasized several times that the captain determines whether and when the tow cable is greased, reversed, repaired or changed.

Although Thompson had responsibility and supervision over the maintenance of Twenty Grand's tugs, he could not, or would not, say how many burrs or how much rust must exist to require a replacement of the cable. On several occasions when confronted with this question, he repeated that it was the captain's responsibility to make those decisions. Thompson admitted that although it was he who gave instructions to the captain and the crew of the tug, he made no investigation to ascertain whether his instructions were implemented. He also admitted that he did not know whether Captain Wilson was qualified to make an accurate judgment as to the condition of the cable and when it should be changed. He testified that there was no record at the tug's home port, or elsewhere, which showed how long the cable had been in use, when it had been lubricated, or whether it had ever been reversed or repaired. As far as he knew, the tow cable on the tug had not been replaced since the tug was commissioned in 1966. Stated differently and more broadly, Twenty Grand had no records upon the tow cable in question.

Harry Wilson was the master of the tug upon this ill-fated voyage. He had never served upon her previously and has not been aboard her since. Although Captain Wilson testified that he personally inspected the cable when it was payed out and taken in, and that "there was nothing wrong with it", the evidence shows that the only inspection which Captain Wilson made of the cable, if in fact he did inspect it, was made while he was engaged with the tug's controls upon the upper deck some 10 or 12 feet from the winch and the cable drum, at a time when he was maneuvering the tug which was under way with the barge in tow. The Court finds that the testimony of Captain Wilson as to the condition of the tow cable has provided very little, if any, probative help.

Larry Rebardie sailed aboard the tug as mate. While at the Port of Palm Beach he saw the rust on the cable near the socket; but it was his opinion that the cable did not then need any lubricant, because it was his view that a cable is greased only when it is rusty all over. He then proceeded to testify that he is no expert on the condition of a cable, or when to change one. He testified that he had never lubricated a cable except at the home port in Morgan City; and that there was no lubricant aboard the tug on this voyage; nor was there an extra cable aboard. Except for seeing the rust on the cable near the socket, when it was pointed out to him by Mansfield, Rebardie made no inspection of the cable at the Port of Palm Beach or at the port at Puerto Rico, or while they were at sea.

The deposition of Joseph Broussard was read. He was the chief engineer aboard the tug. His testimony indicated that he had nothing to do with the cable, except to activate a hydraulic pump in the engine room which furnished power to pay out and retrieve the cable. As chief engineer, Broussard never inspected the cable. Neither did he keep any log upon it. His deposition testimony, like that of the other witnesses who testified for Twenty Grand, furnishes no basis upon which Twenty Grand could be exonerated. Conversely, the weight of the testimony of all of these witnesses demonstrates carelessness on the part of Twenty Grand and the crew of the tug in failing to properly inspect and maintain the cable.

Mansfield, the marine surveyor, who inspected the tug and the barge before it sailed from Palm Beach to Puerto Rico, testified that there was some rust upon the cable near its junction with the socket. It is quite clear that Mansfield inspected the cable only casually.

Obviously, he was primarily concerned with the condition of the fittings at the end of the cable. Otherwise, he would have required the cable to be unwound and laid out so it could be visually inspected, which he did not do. His inspection revealed no more of the cable than the outer wrapping upon the drum. Nevertheless, Mansfield told the mate of the tug that the rusted portion of the cable must be cut off before the next voyage. The testimony of Mansfield impugns the testimony of Captain Wilson, who claims to have inspected the cable and found nothing wrong with it.

After the tow cable parted, the portion attached to the barge was retrieved by Carriers. It was stowed in a warehouse at the Port of Palm Beach until June of 1970, when it was sent to the Pittsburgh Testing Laboratory. There it was examined and tested, after which it was returned to Carriers at the Port of Palm Beach, where it was again stored indoors until it was introduced into evidence at trial. Although the evidence shows that the tow cable was galvanized when first placed in use, there was no galvanizing apparent when the cable was inspected at the laboratory, nor was there any evidence upon or within the cable of any oil-graphite protective compound having been applied. The cable showed extensive corrosion, broken wires and general deterioration. Laboratory testing demonstrated that the original tensile strength of the cable had been substantially diminished by deterioration. The metallurgist who tested the cable found no evidence that its deteriorated condition resulted from being dragged across the bottom of the ocean or from being in contact with the groins in front of the hotel. The evidence shows, and the Court finds, that when the cable was tested at the laboratory its condition was substantially the same as when it was removed from the barge.

After the tug recaptured the barge, and while the tug was at Port Everglades, Captain Wilson cut 100 feet from the end of the towing cable which had been taken aboard the tug, and stowed it in the forward hold. However, for some unexplained reason, that portion of the cable was not aboard the tug when she arrived in Morgan City and has never been produced, or even accounted for. So, there has been no testing of that portion of the cable. Moreover Twenty Grand apparently made no effort to do its own testing upon that portion of the cable which was retrieved by Carriers.

Prior to and during the trial, Twenty Grand abandoned its earlier defense of heavy weather and stipulated that the condition of the weather would not be relied upon in defense of the claims. The prevailing weather conditions on the night in question were not extraordinary. Obviously then, the cable failed because it could not stand the strain which was then placed upon it. The weight of the evidence shows and the Court finds that the cable parted because of the negligence of Twenty Grand and the crew of the tug in failing to regularly and properly inspect, lubricate and reverse the cable and in failing to replace it when it became weakened by deterioration.

## CARRIERS' DAMAGES

As a result of the casualty, the barge was drydocked at Port Everglades on November 2, at which time and place she was surveyed with all interested parties participating. This was a complete survey, except for her internals. The word "internals" means and includes her ribs and interior bottom. The survey was signed by all interested parties, including Twenty Grand and Carriers. In conducting this survey, the individual most in charge was Mansfield, who represented the U. S. Salvage Association. The survey indicated that the costs of repairing the damage of the vessel caused by the failure of the cable would be approximately $100,000, which estimate did not include the cost of repairing the internals.

At the election of Carriers, only temporary repairs were effected at Port Everglades. The permanent repairs were deferred until the barge's next

scheduled haulout. The total bill for temporary repairs at Port Everglades attributable to the casualty was in the amount of $4,448.64. In addition thereto, Carriers was billed and paid the sum of $152.74 to the Port Everglades Authority for dockage and harbor master fees. Both bills were necessarily incurred and are reasonable in amount. Carriers had a cargo contract to fulfill and by limiting the repairs at Port Everglades to temporary repairs, Carriers was able to continue in the performance of that contract and to minimize damages.

Upon completion of the temporary repairs, the barge received a certificate of seaworthiness and on November 3rd she continued in her normal trade. In mid-November the barge encountered heavy weather and sustained topside damages, but not of such severity as to interfere with her continuing in trade. However, in late January and early February, 1970, the barge again encountered heavy weather and again sustained damage to her topside, so extensive that it was necessary to withdraw her from trade and place her in a shipyard for repairs.

The barge was originally constructed at the Livingston Shipyard in Orange, Texas. After being damaged in late January and early February, she was taken to that shipyard where repairs were made simultaneously to her topside and to her bottom. At the trial it was stipulated that she sustained no damages to her topside as a result of the parting of the cable on the night of October 30, and that she sustained no damages to her bottom from the two heavy weather episodes. The barge arrived at the Livingston Shipyard on February 10, 1970. She was drydocked on February 18 and undocked on April 8. She departed that shipyard on April 13.

It was stipulated that it took 21 work days at the Livingston yard to repair the damages which the barge received as a result of the cable failure. No overtime was paid to the Livingston Shipyard. The total charge by Livingston for the repairs to the barge's bottom was $137,802. Thus, the actual costs of repairing the damages which were caused by the parting of the cable exceeded the Port Everglades estimate by more than $37,000; but, as previously stated, the Port Everglades estimate did not include the costs of repairing the internals. Surveyor Mansfield, who was in charge of the Port Everglades survey, testified that neither he nor the others of that survey party went into the double bottoms of the barge. He stated that when the survey was made in Port Everglades he did not know that the interior bottom of the barge had a special wax coating and that the costs of removing and replacing this special coating was not included in the Port Everglades survey. Mansfield also agreed that the Port Everglades survey estimate did not include any structural work within the internals nor did it include any plates which were found to be damaged. He conceded that the quality of marine work varies in different shipyards, and that costs likewise vary. He conceded that the Port Everglades estimate was based on costs at Port Everglades and not upon costs at the Livingston yard. As earlier observed, Carriers' decision to defer the permanent repairs was entirely justified. The Court can find no fault with Carriers' decision to return the barge for permanent repairs at Livingston, where the barge was originally constructed. It nearly always happens that the cost of repairs, whether to a vessel, an automobile or something else, exceeds the earlier estimate. There was no proof that the Livingston Shipyard overcharged for the repairs which were made necessary by the parting of the cable. In the absence of such evidence, the charge made by Livingston in the sum of $137,-802 is found to be reasonable and is approved by the Court.

The evidence shows and the Court finds that the following items of expense were also necessarily incurred and that the charges are reasonable: Surveyor Hallbauer—$787.50; U.S. Salvage Association Survey—$831.00; and Amer-

ican Bureau of Shipping Survey—$302.81.

Walter Byrd, the salvor who was employed by Hallbauer at the request of Carriers, was paid the sum of $4,500. It is clear that Byrd and his two sons rendered valuable and necessary services. The Court has calculated that the three of them were on the job in connection with the salvage operation for a total of approximately 35 hours, and the Court is not unmindful that one of Mr. Byrd's sons swam a tow line from the tug to the barge, and thereby made it possible for the tug to pull the barge from the shallow water into the ocean to safety. However, that act is considered by the Court to be routine and not hazardous. It appears to the Court that a charge of $4,500 for services by Byrd and his sons as salvors is excessive. It is within the province of the Court to establish reasonable compensation for the salvors and the Court has sufficient evidence for that purpose. The Court finds that the sum of $3,000 is reasonable compensation for the services which were rendered by Mr. Byrd and his sons.

In addition to the foregoing, Carriers claims damages in the amount of $6,900 for loss of use of the barge during the two days that it was drydocked at Port Everglades and the 21 days when it was drydocked in Texas. To support this claim, Carriers contends that during that period the tug was under demise charter by Carriers from States Marine at a daily hire of $400 (Carriers is a wholly owned subsidiary of States Marine); but Carriers offered no proof that it was billed for or paid to States Marine daily hire at that price, or any other price, while the barge was in drydock. As further support for this item, Carriers points to an affreightment agreement which it had with a third party for the carriage of cargo to Puerto Rico, which agreement apparently provided for lay days or free time for discharge beyond which demurrage accrued at $2,000 per day and that the demurrage included tug expense of $925 per day; however there is no proof that any such tug expense was charged to or paid by Carriers. Carriers computes the claim of $6,900 for loss of use by arbitrarily claiming the sum of $300 per day for 23 days. In the absence of other satisfactory proof, the proper measure of damages for the period while the tug was in drydock would be the profits or earnings which the tug lost as a result of being so detained. Loss of profits must be shown with reasonable certainty, which would of course include a showing that the vessel would have been profitably employed if she had not been in drydock. No such showing was made by Carriers. No satisfactory effort was made to prove the earnings or profits, if any, which Carriers lost as a result of the barge being in drydock. In this connection, it is significant that during the course of discovery Twenty Grand moved for and the Court ordered Carriers to produce all records concerning the earnings of the barge immediately prior to and subsequent to the casualty but that Carriers failed to produce such records either before or during the trial. For these reasons, Carriers' claim of loss of use of the barge is denied.

Accordingly, the Court finds that as a direct and proximate result of the casualty, Carriers suffered and is entitled to recover from Twenty Grand damages as follows:

| | |
|---|---|
| For temporary repairs at Port Everglades | $4,448.64 |
| Dockage and harbor master fees at Port Everglades | 152.74 |
| Services by surveyor Hallbauer | 787.50 |
| Salvage services by Walter Byrd and his sons | 3,000.00 |
| U. S. Salvage Assn. survey | 831.00 |
| American Bureau survey | 302.81 |
| Bottom repairs by Livingston Shipyard | 137,802.00 |
| Total | $147,324.69 |

Pursuant to a stipulation of counsel at trial consideration of Carriers' claim

for attorneys' fees, and all other claims for attorney fees, has been reserved for a supplemental Hearing.

## HASAM'S DAMAGES

■ At the outset, the Court finds that the hotel and country club property is owned by Hasam; and that in 1957 Hasam, as the owner of the upland, secured a permit from the U. S. Army Corps of Engineers to construct the four groins from the upland into the foreshore of the ocean for a distance of 200 feet, and that the groins were constructed by Hasam in conformity with that permit. The Court finds and concludes as a matter of law that a littoral or upland owner has the right to construct groins into the ocean, provided a permit therefor is first obtained from the Corps of Engineers; and the Court finds and concludes that Hasam has a property interest, in and to the groins which permits it to claim and recover for damages to the groins directly and proximately resulting from the negligence of others.

■ The evidence shows that in September 1969 Hasam entered into a contract with Dock and Marine Construction Corp. for repairs to all four groins. Pursuant to that contract, the construction company was obligated to provide all labor, materials, equipment and insurance necessary to repair the groins for the sum of $7,500, to be paid by Hasam. In accordance with that contract, the construction company undertook the work and repairs to groins 1 and 2 had been completed when the groins were damaged by the barge on October 30, 1969.

The evidence shows that as the barge drifted into the shallow water in front of the hotel, it contacted and damaged groins 1, 2 and 3, in that order. As it moved upon and over each of these groins, it broke and flattened the greenheart timbers and the steel sheeting in such a way as to destroy 25 lineal feet of groin number 1, 75 lineal feet of groin number 2, and 125 lineal feet of groin number 3. There was no damage to groin number 4.

During December 1969, Hasam secured from Reed Construction Company an estimate for the repair of groins 1, 2 and 3, in the amount of $141,563. The president of the Reed Company, John Bettendorf, testified that said sum was a reasonable price for the repair of the groins. He testified that when the groins were constructed in 1957 they had a life expectancy of between 20 and 30 years. He also testified that the groins were performing their intended function at the time of the casualty. Bettendorf is a graduate engineer, 31 years of age, with experience in the construction and repair of groins and other heavy marine construction.

Twenty Grand countered the testimony of Bettendorf by calling as an expert witness, Andrew Potter. He too is a graduate engineer, employed by Engineered Products, Inc., a company which has over a period of years constructed groins and performed other types of heavy marine construction in this area. His credentials are very imposing. He testified that the groins in question had a life expectancy of 10 years and that when they were damaged by the barge they were deteriorated and fully depreciated. So, we have two groin construction witnesses whose testimony is completely different and apparently irreconcilable, as it speaks to the life expectancy of the groins and the condition of the groins at the time of the casualty and as to the cost of repairing the groins.

As previously stated, Bettendorf's company gave an estimate in December of 1969 for the repair of the groins in the sum of $140,563. Potter testified that in December of 1970 his company would have repaired the groins for the sum of $87,192, and that his company would repair the groins in May of 1972 for the sum of $100,995. While tes-

tifying, Potter advised the Court that he would firmly commit his company to repair the groins at that price provided his offer was accepted within thirty days thereafter.

The primary differences between the estimates of Bettendorf and Potter apparently result from the different methods which their companies would employ in repairing the groins and the consideration given by each to the possibility of work being delayed and expense increased by adverse weather conditions. Bettendorf testified that his company would construct a trestle along each groin which would provide a platform from which the work would be done, whereas Potter testified that his company would perform the repairs by the use of a sunken barge which would serve as a platform for the performance of the work. Bettendorf testified that his company increased the cost of its estimate to cover loss of time and increased expense resulting from bad weather, whereas Potter testified that his company added nothing to its contract to cover that contingency.

In addition to these two differences, Hasam insists that the Bettendorf estimate is superior to that of Potter in a variety of ways, some of which will be here mentioned. Among other things, Hasam relies upon Bettendorf's testimony to the effect that a sunken barge would provide an extremely unstable platform for a crane and other equipment and material, necessary for the repairs; Hasam complains that the Potter estimate is written in such a way as to add to the contract price additional costs which might accrue, whereas the contract price offered by Bettendorf is fixed and certain; Hasam insists that the Bettendorf estimate affords greater insurance protection from theft and damage by the elements; and Hasam emphasizes that the Bettendorf company uses union labor whereas the Potter company uses non-union labor. An analysis of the testimony of these two witnesses, along with the exhibits that relate thereto, demonstrates that Bettendorf's estimate is in some respects superior to the Potter proposal. However, the Court cannot ignore the fact that the firm bid offer of Potter is about $50,000 less than the Bettendorf estimate, for the performance of the repairs in 1971, at a time when all labor and material costs have increased. In this connection it is significant to note that in December of 1969, Hasam did not ask for or receive competitive bids, but sought and received only the Bettendorf estimate.

Assuming that the Bettendorf estimate provided Hasam with greater security than the Potter proposal, as the Court must, the Court finds that on a competitive bid basis Hasam could have repaired the groins in December of 1970 for substantially less than the sum of $141,563, which was the Bettendorf estimate. However, the Court can readily understand that a convention hotel and golf club facility which caters to large conventions could ill afford a work interruption, or any other strife, which might result from the use of non-union labor. Considering this factor, along with the other aspects in which the Bettendorf estimate is preferable to the Potter proposal, the Court finds that on a competitive bid basis the cost of repairing the groins in December of 1970 would have exceeded the Potter estimate which was $87,192.

Taking these factors into consideration, and working within the confines of the evidence upon this issue, the Court is of the opinion and finds that by seeking competitive bids Hasam could have repaired the groins in 1970 with union labor, under a contract which would have provided the protections which are absent in the Potter estimate, at a price of approximately $100,000. In reaching this conclusion, the Court has carefully considered, and attempted to apply in a common sense way, all of the evidence in the case that bears on this issue.

The Court is in complete disagreement with the witness Potter as to the life expectancy of the groins, and as to their

condition at the time of the casualty. Although Potter testified that the groins were ineffective and that their lifespan had expired, upon cross examination he was compelled to concede that when he inspected the groins some eighteen months after the casualty, and at a time when the barge damage to the groins had not been repaired, the groins were performing the function for which they were constructed and that the beach in front of the hotel was then satisfactory and stable. Germane to this aspect of the case is the evidence which shows that during October of 1969 the groins were being repaired at a total cost of $7,500, and that the repair of two of them had been completed when they were damaged by the barge. In this regard, the Court finds the testimony of Bettendorf to be more credible and reliable than that of Potter. For some strange reason, Potter tried to persuade the Court that these groins had no value at the time of the casualty, but the evidence, including his own testimony, shows the contrary. The Court finds that at the time they were damaged by the barge the groins had a further life expectancy of 12 years, perhaps more with proper maintenance. Hence, the groins were 50% depreciated at that time. Accordingly, Hasam is entitled to recover $100,000 as the cost of repairing the groins less depreciation to the extent of 50%, or a total recovery of $50,000.

Finally, there is no evidence to support the claim of Hasam against Carriers for damage to the groins—nor is there any evidence to support Carrier's counterclaim against Hasam for damage to the barge. Both claims will be dismissed with prejudice.

## CONCLUSION

Collectively or separately, counsel for the parties shall prepare and submit to the Court judgment forms to be entered in each of the pending cases in conformity with the findings and conclusions which are set forth in this Memorandum Opinion.