635 F.Supp. 830 (1986)
CAHOKIA MARINE SERVICE, INC., Eugene P. Slay and Joan Slay and International Surplus Lines Insurance Company, Plaintiffs,
v.
AMERICAN BARGE AND TOWING COMPANY, in personam, and the M/V ATHENA, her engines, boilers, etc., in rem, Defendants.
No. 85-2655A(1).
United States District Court, E.D. Missouri, E.D.
June 3, 1986.
*831 Thomas A. Connelly, St. Louis, Mo., for plaintiffs.
Frank S. Thackston, Jr., Carl J. Marshall, E. Spivey Gault, Lake, Tindall, Hunger & Thackston, Greenville, Miss., Samuel T. Vandover, Godfrey, Vandover & Burns, St. Louis, Mo., for defendants.

MEMORANDUM
NANGLE, Chief Judge.
This matter is before the Court on the motion of defendant American Barge and Towing Company (American Barge) for summary judgment. In this action, plaintiffs Eugene Slay, Joan Slay, and International Surplus Lines Insurance Company seek to recover for physical damage to an ice shear fence located in the Mississippi River. This damage was allegedly caused by defendant's barge when it collided with the fence. Plaintiff Cahokia Marine Service, Inc. (Cahokia Marine) asserts a claim for loss of business due to damage to the fence. As defendants argue, defendants are entitled to judgment as a matter of law because none of the plaintiffs had any property interest in the ice shear fence at the time of the collision. For the reasons set out below, defendant's motion for summary is granted.

I.
On May 27, 1984, the M/V ATHENA, owned by defendant American Barge, was headed downstream through St. Louis Harbor with a tow of 15 loaded barges. The tow attempted to pass under the Poplar Street Bridge but struck the Illinois pier of the bridge. As a result of the collision, several barges in the tow broke loose. One of those barges, the Tiger 107-B, drifted downriver and came to rest against a large concrete structure known as an ice shear fence or pile dike. This fence lies on the Illinois side of the Mississippi River in the St. Louis Harbor area, immediately upstream from a riverfront facility commonly referred to as the Cahokia Power Plant.[1]
Since before 1929, the Cahokia Power Plant has been owned and operated by *832 Union Electric Company (UE) or its predecessor corporation, Union Electric and Power Company. On May 27, 1979, UE sold the Cahokia Power Plant to G & S Motor Equipment Company (G & S) by quit-claim deed. Then, G & S quitclaimed this property to Eugene and Joan Slay for $1,000,000.00.
The damaged ice shear fence does not lie on the Cahokia Power Plant property. The parties agree that the fence lies just north of the northernmost boundary of this property. Until May 31, 1985, the property on which the fence was located belonged to the Illinois Central Gulf Railroad Company (Illinois Central). On May 31, 1985, the railroad conveyed the property on which the fence stands to Eugene and Joan Slay by quit-claim deed for $100,000.00. The Slays purchased without notice of an earlier license granted by Illinois Central to UE for the erection of a pile dike.
On March 14, 1929, UE and the Illinois Central executed a written instrument, purportedly licensing UE to construct a pile dike on the railroad's property. Under the terms of this instrument, UE assumed all construction and maintenance expenses of the dike and agreed to indemnify the railroad for any loss or expense attributable to the dike. The agreement was to continue in force indefinitely but could be terminated by either party upon 30 days' notice. Within ten days of termination, the railroad could require UE to remove the dike.
Pursuant to their agreement and by letter dated December 11, 1978, UE terminated the agreement and requested a waiver of the condition requiring removal of the dike.[2] As the letter explained, the dike prevented erosion of both the railroad property and the adjoining power plant property. By letter dated February 23, 1979, the Illinois Central informed UE that it considered the agreements terminated as of December 11, 1978.[3] Illinois Central also agreed not to require UE to remove the dike.
On November 27, 1985, defendant American Barge settled with the Illinois Central and obtained a release of all claims for damages resulting from the barge accident. In this agreement, Illinois Central warranted that at the time of the accident it was the sole owner of the ice shear fence.
After the Slays purchased the Cahokia Power Plant, they attached a wire to the ice shear fence. This wire, known as a breast wire, helped secure anchored barges in the Cahokia Marine fleet. In addition, the Slays installed a deadman anchor north of the power plant on the Illinois Central property. This anchor also secured barges in the Cahokia Marine Fleet. Representatives of the Illinois Central complained to Eugene Slay about the placement of the deadman anchor on railroad property but did not complain about the attachment of the wire to the fence.

II.
This Court has jurisdiction over this admiralty action. 28 U.S.C. § 1333 and 46 U.S.C. § 740.
*833 Under Rule 56 of the Federal Rules of Civil Procedure, a movant is entitled to summary judgment if he can "show that there is no genuine issue as to any material fact and that [he] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). See also Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). In passing on a motion for summary judgment, a court is required to view the facts and inferences that may be derived therefrom in the light most favorable to the non-moving party. Buller v. Buechler, 706 F.2d 844, 846 (8th Cir.1983); Vette Co. v. Aetna Casualty and Surety Co., 612 F.2d 1076, 1077 (8th Cir.1980). The burden of proof is on the moving party, and a court should not grant a summary judgment motion unless it is convinced that there is no evidence to sustain a recovery under any circumstances. Buller, 706 F.2d at 846. However, under Rule 56(e), a party opposing a motion for summary judgment may not rest upon the allegations of his pleadings but "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). See also 10A Wright, Miller and Kane, Federal Practice and Procedure, § 2739 (1983).
In Count I, plaintiff Cahokia Marine seeks to recover for economic losses resulting from damage to the ice shear fence. Presumably, Cahokia Marine was unable to dock its fleet of barges at the Cahokia Power Plant after the accident. As defendant argues, because Cahokia Marine never had a proprietary interest in the ice shear fence, Cahokia Marine fails to state a claim. Plaintiff Cahokia Marine has not responded to this argument.
Claims for economic loss unaccompanied by physical damage to a proprietary interest are not recoverable in maritime tort. Robins Dry Dock & Repair Co. v. Flint, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed.2d 290 (1927); Louisiana ex rel. Guste v. M/V TESTBANK, 752 F.2d 1019 (5th Cir.1985); In re Williamson Leasing Co., Inc., 577 F.Supp. 890 (E.D.Mo.1984). In Williamson, railroad employees sought to recover for economic losses suffered after a barge collided with a railroad bridge and closed the bridge to railroad traffic. Consequently, railroad employees were temporarily layed off. Applying the rule of Robins Dry Dock, the court dismissed the action.
This Court finds the principle of Robins Dry Dock applies to the facts of this case. Here, plaintiff Cahokia Marine seeks to recover economic losses but does not allege a proprietary interest in the ice shear fence. Therefore, defendant is entitled to judgment as a matter of law.
In Count II, plaintiffs Eugene and Joan Slay seek to recover for physical damage to the ice shear fence.[4] As defendant argues, plaintiffs cannot recover because the Slays did not own the fence at the time of the collision, and the railroad's right of action did not pass to the Slays as a subsequent purchaser. Plaintiffs have shifted their position during the course of this litigation. In their complaint, plaintiffs allege ownership of the fence in fee at all relevant times. However, in response to the summary judgment motion, plaintiffs assert an easement in the fence. As plaintiffs argue, the December 11, 1978 letter and the February 23, 1979 response grant UE an express easement appurtenant. This easement passed to the Slays when they purchased the Cahokia Power Plant, the dominant tenement. Alternatively, the plaintiffs assert an interest in the fence created when their predecessor, UE, built the structure to benefit its property. Plaintiffs do not assert a claim based upon their subsequent purchase of the fence.
The Court must first choose the proper law to apply. Generally, the rights of riparian landowners along a navigable stream are governed by state law. Oregon ex rel. State Land Board v. Corvallis Sand & Gravel Co., 429 U.S. 363, 378-81, 97 S.Ct. 582, 590-92, 50 L.Ed.2d 550 (1977).[5] *834 All property at issue in this lawsuit lies on the Illinois side of the Mississippi River. Thus, Illinois law applies.
The first issue is whether UE had an easement appurtenant in the fence and whether this easement passed to the plaintiffs. Under Illinois law, an easement appurtenant is a right or privilege in the real estate of another exercised in connection with occupancy of other land. Beloit Foundary Co. v. Ryan, 28 Ill.2d 379, 192 N.E.2d 384 (1963). Easements may be created by contract as well as by grant, but such agreements must be construed so as to carry out the plain intent of the parties. Chicago Title & Trust Co. v. Wabash-Randolph Corp., 384 Ill. 78, 51 N.E.2d 132 (1943). Easements established by contract must contain the formal elements of a deed. Coomer v. Chicago and Northwestern Transportation Co., 91 Ill.App.3d 17, 46 Ill.Dec. 812, 414 N.E.2d 865 (1980). Though no particular words are necessary to constitute a grant of an easement, such words must show clearly an intention to confer the easement. Aebischer v. Zobrist, 56 Ill.App.3d 151, 13 Ill.Dec. 911, 371 N.E.2d 1003 (1977). An easement appurtenant passes with the dominant tenement without specific mention in the deed or sale contract. Harris Trust and Savings Bank v. Chicago Title & Trust Co., 84 Ill.App.3d 280, 39 Ill.Dec. 658, 405 N.E.2d 411 (1980).
No document expressly grants an easement appurtenant to the Slays or to their predecessor, UE. Instead, plaintiffs rely upon the two letters between UE and Illinois Central to establish an easement. The Court finds the clear intent of these letters was to terminate the 1929 license. Neither letter contemplates any further relationship between the parties with respect to the ice shear fence. Furthermore, plaintiffs present no evidence to indicate that these letters do not contain the true or complete intent of UE and Illinois Central. Therefore, the correspondence between UE and the railroad did not grant an easement, and an easement appurtenant did not pass to the Slays when they bought the power plant property.[6]
Plaintiffs also assert a property interest in the ice shear fence because the fence was constructed by UE to benefit its property. Plaintiffs rely upon Crawford v. West India Carriers, Inc., 337 F.Supp. 262, 276 (S.D.Fla.1971) rev'd sub nom. on other grounds, Twenty Grand Offshore Inc. v. West India Carriers, Inc., 492 F.2d 679 (5th Cir.), cert. denied, 419 U.S. 836, 95 S.Ct. 63, 42 L.Ed.2d 63 (1974), which they cite for the principle that a riparian landowner who constructs a structure on land owned by another has a property interest in the structure which permits recovery for damage resulting from others' negligence. In Crawford, an ocean-going barge ran aground and damaged groins used to protect beach front hotel property.[7] The hotel owner did not own the property on which the groins stood but had obtained a permit from the U.S. Army Corps of Engineers to construct the groins. Thus, the hotel owner had an interest in the nature of a servitude for the construction and maintenance of the groins. As the court held, the plaintiff had a property interest in the groins which permitted him to recover for their damage. Though this Court has found no Illinois law on point, we may assume that Illinois courts would apply this common law principle.
Crawford may be distinguished from the instant case. In purchasing the power *835 plant, the Slays could only acquire the rights which their predecessors held. Thus, the Court must look to the interests held by UE. UE had a license to construct and maintain the fence but relinquished its rights when it terminated the license. At that point, UE's interest in the fence reverted to the railroad. As discussed above, UE did not receive an easement or other servitude upon termination of the license. Furthermore, UE obtained no legally cognizable interest merely because the fence benefited UE property. Consequently, the Slays have no interest in the fence and may not recover for its damage.
NOTES
[1] The relevant parcel of this property is described by deed as follows:

A tract of land composed of portions of the accretions to Lots No. 225, 228, 229 and 232 of the "SUBDIVISION OF PART OF COMMONS OF CAHOKIA OR SURVEY NO. 759"; reference being had to the plat thereof recorded in the Recorder's Office of St. Clair County, Illinois in Book of Plats "A" on page 60, more particularly described as follows, to-wit:
Beginning at an iron pipe set in the Western line of the right of way conveyed by E.C. Kehr to the Venice & Carondelet Railway Company by Deed dated October 26th, 1882 and recorded in Book 171 on page 246, in the Recorder's office of St. Clair County, Illinois, where it is intersected by the Southern line of the land of the St. Louis, Belleville & Southern Railroad Company, established by an agreement between the said Railroad Company and E.C. Kehr and Julius Pitzman by deed dated April ___ 1900 and recorded in book 268 on page 310, in said Recorder's Office and running thence North 73 degrees 33 minutes West along said Southern line established by said agreement to the Eastern Outer Harbor line as established by the Secretary of War in 1903, thence Southwardly along the Eastern Outer Harbor line to a point from which the Northwest corner of the land herein described bears North 17 degrees 52¼ minutes East 1000 feet, thence South 68 degrees 42½ minutes East 1930 feet to an iron pipe, thence North 31 degrees 41¾ minutes East along the Western line of the right of way conveyed by E.C. Kehr to the aforesaid Venice and Carondelet Railway Company, 1205 feet to the place of beginning, containing 51.6 acres, more or less.
[2] In pertinent part, the letter stated:

We also desire to terminate an agreement dated March 14, 1929, between Illinois Central Railroad Company and Union Electric Light and Power Company covering the right to construct and maintain a pile dike and riprap pavement on the subject property of the Railroad. The purpose of this work was to prevent erosion to the Railroad property and to our adjoining property. We feel that it would be beneficial not to remove these facilities and request our waiver of the condition in the agreement where the Railroad can require the removal of the dike and riprap paving from the premises.
[3] Illinois Central replied in pertinent part:

This refers to your letter December 11, 1978 concerning the desire of Union Electric Company to terminate, at this time, ... an agreement dated March 14, 1929 covering a pile dike and riprap pavement.
This is to advise the Illinois Central Gulf Railroad Company has no objections to the termination of these agreements and, also, that we will not require your company to remove the dike and riprap paving from our premises as provided for in the March 14, 1929 agreement.
We shall consider the agreements as having been terminated and of no further force and effect as of January 11, 1979, except for any liabilities that may have accrued thereunder prior to such termination date.
[4] International Surplus Lines Insurance Company has been joined as a necessary party.
[5] However, if the navigable stream forms an interstate boundary, federal common law governs rights to the bed on the boundary. 429 U.S. at 375, 97 S.Ct. at 589. This exception to the general rule does not apply in the instant case because the property in question does not lie on the Illinois-Missouri boundary but lies entirely within Illinois. In other words, federal common law does not apply because the outcome of this litigation will not alter an interstate boundary.
[6] In his affidavit, Eugene Slay states that during negotiations for the power plant property UE representatives told him that the fence was part of the power plant. Assuming UE made such statements, these statements do not create, ex proprio vigore, a property interest upon which the Slays may recover against a third party.
[7] A groin is a structure for the protection of uplands against erosion and other action of the sea. See 38 C.J.S. Groin (1943).