Paul K. BRADY, Lloyd E. Deir, Beldon N. Little and Alvah E. Sadler, Libellants,

v.

THE STEAMSHIP AFRICAN QUEEN, her engines, tackle, apparel, etc., Respondents.

No. 8056.

United States District Court
E. D. Virginia,
Norfolk Division.

Jan. 11, 1960.

As Amended Jan. 28, 1960.

322

Vandeventer, Black & Meredith, Hugh S. Meredith, Norfolk, Va., Landon Maxey, Suffolk, Va., and J. Lewis Rawls, Jr., Norfolk, Va., for Brady, Deir and Sadler.

Henry E. Howell, Jr., Norfolk, Va., for Little.

David H. Batchelder, Jr., Norfolk, Va., and Zock, Petrie, Sheneman & Reid, John Sheneman, New York City, for Gifford B. Warner, intervening libellant.

Seawell, McCoy, Winston & Dalton, Harry E. McCoy, Norfolk, Va., for Norfolk Shipbuilding & Drydock Corp., intervening libellant.

WALTER E. HOFFMAN, District Judge.

In this controversy between the libellants, Brady, Deir, Little and Sadler, on the one part, and the intervening libellant, Warner, on the other part, it is clear that Warner first boarded the stern section of the African Queen on March 11, 1959, following its abandonment by the owners and underwriters on February 12, 1959; the vessel having previous-

ly grounded on a shoal nine miles off the coast of Ocean City, Maryland, on December 30, 1958, and her bow section having split from the stern and floated approximately two miles away.

 The evidence conclusively establishes that the libellants, Deir and Little, together with their financial backers, Brady and Sadler, performed all of the salvage operations incident to raising the stern section and finally succeeded in towing the stern of the vessel into Norfolk during the early morning of September 27, 1959. These libellants had remained aboard the vessel, either in person or through their representatives, continuously since March 17, 1959, following their initial visit to the vessel on March 14, 1959. They have expended large sums of money in a venture which has been given widespread publicity by reason of their accomplishments under adverse conditions. Treating libellants' claim in the light of a salvage operation, aside from the claim of the intervening libellant, the salvage services far exceed the value of the vessel in the present day open market.

The intervening libellant, Warner, placed too much stress upon the assertion of legal rights, and not enough in support of his intentions to justify his claim either as a finder or salvor. His position is not unlike that of the young man who expresses an interest in a young lady. In effect, he had one date with the lady and she aroused his interest sufficiently to make it appear that he would like to pursue the romance if the young lady was attractive from a monetary standpoint. With knowledge, however, that another suitor was engaging in a courtship, the intervening libellant elected to take no further action and awaited the result of the activities of the subsequent suitor. Now that the second suitor has pursued his courtship with success, and his proposal of marriage has been accepted, the rejected suitor registers his objection to the marriage. His objection comes too late.

 While it is conceded that one who has taken possession of a vessel, has begun the salvage service, and is successfully prosecuting it, is entitled to the sole possession of the property, the activities of Warner with respect to the stern section fall far short of meeting these essentials. Considering the evidence as a whole, this Court is unable to find that Warner posted the stern section on March 11, 1959, in the manner related by him. The testimony of Croswell who, together with one Townsend, accompanied Warner to the wreck on March 11, pointedly suggests that Warner posted no signs and, in any event, made no statement as to his intentions of salvaging after it was determined that the cargo of oil was no longer fit for salvage. Townsend was not called as a witness and it is a proper assumption that, if called, his testimony would not have assisted Warner in any respect. Indeed, it is seemingly strange that one is so secretive as to his intentions when we know that, beginning March 13, 1959, a legal advertisement appeared in the "Salisbury Times" asserting Warner's alleged lawful right of sole and exclusive possession of the *entire* vessel when, in fact, Warner had not been within two miles of the bow section at the time. We conclude, from a consideration of the statements thereafter made by Warner,[1] that the publication of the legal notice was merely a means devised to discourage other interested salvors, thereby giving Warner an opportunity to explore the possibilities of salvage. Such actions on the part of a prospective salvor are insufficient to entitle one to sole possession of the vessel.

 That Warner was guided by advice of counsel at all stages is obvious. On March 19, 1959, his New York proctors addressed a letter to the Deir-Little-

1. Statements made by Warner to a reporter for the "Salisbury Times" and an agent of the Federal Bureau of Investigation clearly point to the fact that, as late as March 22, 1959, Warner had not yet determined the feasibility of engaging in salvage operations.

Brady combine. This letter, while stating that subsequent successful salvage would inure exclusively to the benefit of Warner, carries with it a threat of immediate litigation in the admiralty court. Rather than pursue this remedy, Warner elected to await the results of the salvage efforts and permitted the successful salvors to expend approximately $112,000 before succeeding in a venture not yet financially beneficial. If the doctrine of equitable estoppel has any place in this field, it is peculiarly appropriate here.

■ Warner's contention that he was prohibited "by force of arms" from carrying on his operations is nothing but a figment of his imagination. Posed photographs revealing Deir and Little in possession of shotguns were nothing more than newspaper publicity known to be such by Warner. Such an argument as advanced by the intervening libellant does not even merit further discussion. Furthermore, Warner's entire testimony relating to equipment obtained to conduct his salvage operations is of doubtful validity as he constantly referred to notes which were apparently made from memory after Warner's original notebook was lost from the bow section of the African Queen during a July storm.

■ In the libel filed herein the Court is requested to declare that the libellants are the true and lawful owners of the stern section of the African Queen or, in the alternative, that a salvage award be made which is equal to the proceeds of the sale of that portion of the vessel. Having held that libellants did not wrongfully interfere with any prior legal rights of the intervening libellant, and having stated that the value of libellants' salvage services exceeds the value of the stern section of the vessel, it is unnecessary to adjudicate libellants' rights as "finders" or "salvors".

They would, in any event, be entitled to receive the entire proceeds of any sale, less court costs and other outstanding claims [2]. In Norris on the Law of Salvage, § 158, p. 288, it is said that "a 'find' in maritime law differs from salvage in that in the former instance the property found has never been owned by any person". The foregoing statement is not free from doubt when applied in extreme cases where the property is wholly derelict and affirmatively abandoned by the owners and underwriters. Were it necessary to so conclude, this Court would agree with the logic and reasoning applied in Eads v. Brazelton, 22 Ark. 499, a case decided in 1861, which considers at length the character of possession requisite to establish rights thereunder. If possession is sufficient when one boards the derelict, any one of the many watermen who boarded the stern section of the vessel prior to the libellants and intervening libellant would have a superior claim. A salvor cannot assert a claim merely by boarding a vessel and publishing a notice, unless such acts are coupled with a then present intention of conducting salvage operations, and he immediately thereafter proceeds with activity in the form of constructive steps to aid the distressed property. When he finally determines that he will, in good faith, conduct such operations and pursues his constructive steps, he is then, and only then, in a position to assert his claim subject to the rights of others which may have intervened while he is exploring the prospects of such operations.

Adopting this memorandum as its findings of fact and conclusions of law pursuant to General Admiralty Rule 46½, 28 U.S.C.A., but reserving to proctors the right to request further specific findings and conclusions, a decree will be entered upon presentation.

**2.** Claims filed by Norfolk Shipbuilding & Drydock Corporation and certain divers, Crofton and Morris, are expressly reserved for further determination.