Donald **HENER, Michael Mazzei, Charles Reisinger, Jerome Morici, and Ocean Salvage, Inc. and Associates, Plaintiffs,**

v.

**UNITED STATES of America, American Commercial Divers, Inc., British and Foreign Marine Insurance Company, Ltd. and Chubb & Son, Inc., Defendants.**

No. 81 Civ. 3857.

United States District Court,
S. D. New York.

Oct. 15, 1981.

Hill, Betts & Nash, New York City, for plaintiff Ocean Salvage; Mark M. Jaffe, New York City, of counsel.

Hynes, Diamond & Reidy, P.C., New York City, for plaintiffs; Robert J. Gogick, New York City, of counsel.

Donovan, Maloff, Walsh & Kennedy, David L. Maloof, New York City, for defendants American Commercial Divers, Inc., British and Foreign Marine Insurance Co., Ltd. and Chubb & Son, Inc.

John S. Martin, U. S. Atty., S. D. N. Y., New York City, for U. S. Dept. of Justice Torts Branch—Civ. Div.; Janis G. Schulmeisters, New York City, of counsel.

Lord, Day & Lord, J. Bond Smith, Jr., New York City, for American Smelting & Refining Co.

SOFAER, District Judge:

On September 27, 1903, at approximately two o'clock in the morning, the barge *Harold*, carrying 400 tons of lead and silver bullion, pitched violently in the waters of the Arthur Kill, off Staten Island, and dumped most of its cargo. The cargo consisted of 7,678 ingots (or "pigs") of silver, each about eighteen inches long. At the time, the *Harold* was being towed to the cargo owner, American Smelting and Refining Company ("ASARCO"), in Perth Amboy, New Jersey. ASARCO informed its underwriters, Chubb & Son and British Marine Insurance Company (the "Underwriters"), of the loss, and a dredging and diving operation was immediately commenced. Before the operation was terminated on October 16, 1903, an estimated 85% of the silver was salvaged from an area known as Story Flats, between Sewaren, New Jersey, and Staten Island. The unrecovered cargo is assumed to have been left on the bottom of the Kill.

When the *Harold* silver fell into the Arthur Kill in 1903, the value of the entire cargo was approximately $100,000. *N.Y. Times*, Oct. 17, 1903, at 1, col. 3. At the high price reached by silver about a year ago, the value of the unrecovered cargo alone was estimated to be between $80 and $100 million, and the parties believe that, even at current prices, the unrecovered cargo is worth between $10 and $20 million. As silver prices have increased, both commercial and amateur divers in the United States have taken an increased interest in diving for the treasure. The *Treasure Divers' Guide*, published in 1972, contains a description of the *Harold* incident drawn from an article in the *New York Times* of October 17, 1903, and from other publicly available sources. J. Potter, *Treasure Divers' Guide* 480–81 (1972).

This case involves a dispute among three separate groups of divers for the right to attempt to salvage any remaining silver from the *Harold* cargo. The Underwriters, ASARCO, and perhaps others may, at a future time, dispute title to whatever silver is recovered. At present, however, the parties agree that ownership of the silver is irrelevant. The competing groups all base their claims on the maritime law of salvage.

The plaintiffs who commenced this suit—referred to collectively as the "Hener Group"—are amateur divers who sought to enjoin the United States Coast Guard, and, more generally, the United States, from enforcing a safety zone that precluded them from diving operations on and near Story Flats. The intervenor-plaintiff, Ocean Salvage, Inc., comprises divers and investors led by Robert P. Hooper (the "Ocean Group") who also have been prevented from diving in the Coast Guard's safety zone. The intervenor-defendant, American Divers, Inc., is a company recently formed by a third group of divers and investors (the "American Group"), who seek to recover the *Harold* silver from a stretch of the Arthur Kill that encompasses Story Flats. Although the Coast Guard established the safety zone at the request of the American Group, it asserts that doing so was necessary and within its discretion and disclaims

any interest in who may dive or who owns any silver that is recovered. The Coast Guard has joined the parties in asking this Court to answer the underlying questions of maritime law (salvage and ownership), after which it will reexamine its maintenance of the safety zone with a view toward implementing the Court's decision. Transcript of Hearing 14–15 (June 26, 1981).

The Hener Group originally sought a preliminary injunction to prevent the Coast Guard from interfering with its operations. The Ocean Group, seeking to protect its own operations, eventually joined this application; the American Group opposed it. Because the Coast Guard has agreed to the zone's modification to accommodate the judicially declared rights of the parties, however, it was unnecessary and inappropriate to review the legality of plaintiffs' exclusion from the safety zone before determining the rights of the three competing groups.

A several-day hearing was held to afford all interested parties a full opportunity to present testimony and documentary evidence. At its conclusion, the parties agreed to treat the record as complete for a final adjudication of which groups are entitled to attempt to salvage the silver. Transcript of Hearing 876 (July 15, 16, 17, & 22, 1981) [hereinafter cited "Tr."]. *See* Fed.R.Civ.P. 65(a)(2); *SEC v. North Am. Research & Dev. Corp.*, 511 F.2d 1217, 1218 (2d Cir.), *cert. denied*, 423 U.S. 830, 96 S.Ct. 49, 46 L.Ed.2d 47 (1975). On the basis of the findings and conclusions set forth below, the Court entered an order on August 17, 1981, that declares that the Ocean Group is entitled to search for silver at the site believed by Robert Hooper to be the original excavation (the "Hooper site") and that the American Group is entitled to act as salvor everywhere else in the Coast Guard's safety zone, except for a buffer zone extending 300 feet in all directions from the Hooper site.

## I. *Jurisdiction*

The Hener Group's original complaint challenged the Coast Guard's enforcement

of a safety zone that excluded Hener from diving in the vicinity of Story Flats. When the complaint was filed, the propriety of reviewing a discretionary Coast Guard order prior to exhaustion of administrative remedies seemed doubtful. Since then, two developments have dispelled any doubts about jurisdiction. First, the Coast Guard has itself sought to have this Court adjudicate the disputes among the competing divers and meanwhile has suspended its own administrative processes. Second, the Ocean Group intervened, filing a complaint that rests jurisdiction squarely on 28 U.S.C. § 1333 (1976), which grants federal courts jurisdiction over all cases that involve admiralty or maritime claims. In the absence of any exhaustion bar, section 1333 supports jurisdiction here. As Judge Randall reasoned in *Treasure Salvors, Inc. v. Unidentified Wrecked and Abandoned Sailing Vessel*, 640 F.2d 560, 566–68 (5th Cir. 1981) (*"Treasure Salvors III"*), jurisdiction lies in federal court to adjudicate a maritime salvage dispute between would-be salvors who submit themselves to the court's *in personam* jurisdiction. Under *Treasure Salvors III*, this Court would have jurisdiction even if the cargo sought to be raised were beyond the territorial limits of the United States: although rights to the cargo "may be the subject of the dispute, the adverse parties in this situation are the competing salvors." *Id.* at 567. In any event, the cargo here is well within this nation's territorial waters, within the control if not the geographic area of this District, and hence within the jurisdiction of this Court. *Cf. State of Florida, Dep't of State v. Treasure Salvors, Inc.*, 621 F.2d 1340, 1346–47 (5th Cir. 1980) (*"Treasure Salvors II"*) (admiralty in rem jurisdiction generally requires res to be in district but ancillary process available if major portion of res within court's "control").

## II. Governing Legal Principles

All the parties contemplate a three-step process for deciding the issues in the case. First, they suggest, this Court should decide who is entitled to salvage the silver, and where in the Kill and under what conditions those who are entitled to salvage may do so.

Each of the three competing parties of salvors claims to have been the first salvor, and each claims an exclusive right to search and salvage from part or all of the area known as Story Flats. The Court's salvage decision would be followed by a period during which the parties permitted to salvage would, under judicial and other governmental supervision, attempt to recover the cargo. When salvage operations cease, or at any other time specified by the Court, a second trial would be held, this one limited to the issue of who owns any recovered property. If the Court then found that the property was abandoned, it would distribute the property to its finders. If the Court found that title to the property remained in its prior owner, it would identify and return the property to that owner and go on to determine the appropriate salvage fees. Both the parties that claim title to the silver—the Underwriters and ASARCO—are satisfied to allow the three would-be salvors to compete for the right to salvage; neither attempts to assert its alleged title as a bar to salvage, the Underwriters having expressly abandoned an earlier effort to do so. *See* Brief on Behalf of Applicants-Interveners at 11–15 (June 26, 1981); Transcript of Hearing 6–7 (July 8, 1981).

The contemplated procedure, under which competing salvage claims are adjudicated before title to the silver is determined, is in fact the proper method for handling this novel case. The propriety of the suggested procedure, however, is far less certain than the parties assume. The law of salvage and the law of finds, not always distinguished by admiralty courts, lead to different results in this case. As a consequence, it is essential to decide which law should govern this proceeding. For several reasons, the law of salvage is the preferable set of principles to apply, even though the property sought to be salvaged may ultimately be found to have been abandoned. Applying that law, the record establishes with little doubt which parties qualify as salvors and are therefore entitled to an opportunity to try to recover the *Harold's* silver.

## A. *Application of the Law of Finds*

The common law of finds treats property that is abandoned as returned to the state of nature and thus equivalent to property, such as fish or ocean plants, with no prior owner. The first person to reduce such property to "possession," either actual or constructive, becomes its owner. R. Brown, *The Law of Personal Property* 15 (2d ed. 1955). A mere "searcher" has no rights in abandoned property even if he succeeds in locating it; in particular, he has no right to exclude others from the attempt to recover it. Any competing searcher is entitled to enter the area where the abandoned property is and to seek to reduce it to his possession, as long as he acts without infringing on the concurrent rights of other searchers. Annot., 63 A.L.R.2d 1369 (1959).

The burden placed on a finder of abandoned property is illustrated by the early American case of *Eads v. Brazelton*, 22 Ark. 499 (1861). In December 1854, the plaintiff Brazelton found a wreck that had sunk in the Mississippi River in November 1827 bearing a cargo that included shot and bars of lead. After the boat sank, its owners attempted to salvage its cargo and equipment. Much of the cargo was recovered, but some shot and about 3000 pigs of lead were left in the river, abandoned by the owners. *Id.* at 502, 508. Brazelton intended to raise the sunken lead and, in January 1855, returned to the wreck with a diving boat. He fastened a buoy to a weight that rested on the wreck and, expecting to begin work the next day, left the site. But the press of other business, and the difficulty and danger of the work, led Brazelton to defer the project. Brazelton waited too long. When he was finally ready and able to begin, and he was heading toward the wreck, his boat was passed in the river by the steam-powered Submarine, No. 4, belonging to Eads & Nelson, a firm of wreckers doing business on the Mississippi. On September 28, 1855, Eads found the wreck and began raising the cargo.

In refusing to recognize any of Brazelton's asserted rights in the wreck, the Court found that the wreck's location had been well known and that Eads had found it without exploiting Brazelton's labors. The Court also observed that, although Brazelton had intended to appropriate the wreck and its cargo to himself, he "had not actually appropriated it to himself [and] his intention to possess was useless without detention of the property." *Id.* at 511. The Court made clear that "Brazelton's act of possession need not have been manual," but he was required to take "such possession of [the wreck and cargo] as their nature and situation permitted." *Id.*

The opinion of Justice Fairchild in *Eads v. Brazelton* accurately and comprehensively sets out the law of finds. It refers to, and relies on, a broad range of authorities for its conclusions, and its premise that a finding requires both intent and some form of possession remains accurate. *See Edmonds v. Ronella*, 73 Misc.2d 598, 599, 342 N.Y.S.2d 408, 410 (Sup.Ct.1973); R. Brown, *supra*, at 15–32. According to a modern restatement of the *Eads* doctrine, "[t]he orthodox view of possession regards it as a union of the two elements of the physical relation of the possessor to the thing, and of intent ... [, but t]hat power over the thing which the nature of the thing itself permits me to exercise is sufficient." R. Brown, *supra*, at 21. In *Eads*, for example, had Brazelton placed his boat over the wreck with the means to raise its valuables, and had he persisted in "efforts directed to raising the lead," his conduct would have constituted "the only effectual guard over it" and thus a judicially recognizable warning that other "longing occupants" would have been obliged to regard. 22 Ark. at 512. *See also* R. Brown, *supra*, at 21–22 (possession is the power to exclude others from a "like control," which may be said to exist when others cannot interfere without violating some independent right of person or property).

The law of finds would preclude an award of the property in this case to any of the three competing groups. Although all three groups have made some efforts to locate the *Harold* silver, none has succeeded. That all three have focused their ef-

forts on Story Flats establishes nothing in their favor. Anyone interested in searching for treasure could readily have discovered from public sources the tale of the *Harold* and its cargo. However clearly all three intend to take possession of the silver, no silver has been located, let alone possessed or controlled.

In the *Treasure Salvors* litigation, Treasure Salvors, Inc. ("TSI"), the group responsible for finding the treasure, was awarded title to and an exclusive right to recover the entire cargo, which was scattered over a wide area and portions of which had not yet been located. *See Treasure Salvors, Inc., v. Unidentified Wrecked and Abandoned Vessel,* —— F.Supp. ——, No. 75–1416 (S.D. Fla. July 2, 1981). The facts of that case, however, readily justified a ruling for TSI under the law of finds. TSI had not only the intent to acquire the entire cargo but the proven capacity to do so. More important, TSI had recovered a large part of the cargo and had placed the rest within its possession to the extent consistent with the nature of the cargo, and TSI was engaged in systematic, unrelenting work to recover all the remaining cargo from the entire area over which it was scattered.

The courts involved in the *Treasure Salvors* litigation relied in part on the law of salvage in awarding TSI exclusive rights to unrecovered cargo. *See, e. g., id.* at 11 ("[TSI] is engaged in a salvaging operation coupled with a discovery procedure that goes with a 'finds' situation . . . ."); *id.* at 12 (quoting Judge Mehrtens's original Order of Summary Judgment, dated Feb. 2, 1970, which confounds the law of salvage and the law of finds) ("General principles of maritime and international law dictate that an abandonment constitutes a repudiation of ownership, and that a party taking possession under salvage operations may be considered a finder under the doctrine of 'animus revertendi,' i. e., the owner has no intention of returning."). But reliance on salvage law was both conceptually unwarranted and unnecessary in the TSI litigation to achieve an otherwise equitable and proper result. All the parties to that litigation assumed that the cargo had been abandoned, and as between TSI and its two most formidable competitors, the United States and the State of Florida, the issue of ownership to the cargo had already been adjudicated. *Treasure Salvors I, supra; Treasure Salvors II, supra.* TSI was an adjudicated finder, and hence owner. Here, by contrast, none of the competing parties is a finder. Thus, if the property was in fact abandoned, no party would have the right as a finder to exclude any of the others from participating in the search. Indeed, no party would have the right to exclude any other would-be finder from any area except perhaps the precise location at which each party chose to place its equipment and personnel. The mere chase of silver no more establishes its possession than the chase of wild beasts. *See, e. g., Pierson v. Post,* 3 Caines 175, 2 Am.Dec. 264 (N.Y. 1805).

## B. Which Law Governs: Salvage or Finds?

In cases in which property has actually been found, as it was in *Treasure Salvors,* or in which property has been affirmatively forsaken, *see Brady v. The S.S. African Queen,* 179 F.Supp. 321, 324 (E.D.Va.1960); *Wiggins v. 1100 Tons, More or Less, of Italian Marble,* 186 F.Supp. 452, 456–57 (E.D.Va.1960), the distinction between finds and salvage may seem unimportant. But in most salvage cases, including this one, the differences between these two doctrines are highly material. Indeed, Martin Norris, a leading commentator, has expressed concern about the implications of the "[s]everal modern [maritime] cases that have applied the rule of 'find' with its concomitant dogma of 'finders keepers' to instances of long lost and abandoned wrecks." 3A M. Norris, *Benedict on Admiralty: The Law of Salvage* 11–14 (7th ed. rev. 1980) (footnote omitted). According to Norris, the law of finds should apply in maritime cases only to long-lost wrecks, openly abandoned property, and things found in seas or rivers that were never the property of any person. *Id.* at 11–15. In fact, admiralty has historically disfavored the law of finds, preferring instead the distinct policies of the law of salvage.

The law of finds is disfavored in admiralty because of its aims, its assumptions, and its rules. The primary concern of the law of finds is title. The law of finds defines the circumstances under which a party may be said to have acquired title to ownerless property. Its application necessarily assumes that the property involved either was never owned or was abandoned. An owner may rebut that assumption by showing non-abandonment, and the law of finds accommodates this possibility by granting title to the finder against all the world except such an owner. *Weeks v. Hackett*, 104 Me. 264, 71 A. 858 (1908). To justify an award of title (albeit of one that is defeasible), the law of finds requires a finder to demonstrate not only the intent to acquire the property involved, but also possession of that property, that is, a high degree of control over it.

These rules encourage certain types of conduct and discourage others. A would-be finder should be expected to act acquisitively, to express a will to own by acts designed to establish the high degree of control required for a finding of possession. The would-be finder's longing to acquire is exacerbated by the prospect of being found to have failed to establish title. If either intent or possession is found lacking, the would-be finder receives nothing; neither effort alone nor acquisition unaccompanied by the required intent is rewarded. Moreover, if the property is ultimately found not to have been abandoned the law of finds permits no reward, even for efforts to recover the property that have been partly or completely successful. *Watts v. Ward*, 1 Or. 86, 62 Am.Dec. 299 (1854). Furthermore, success as a finder is measured solely in terms of obtaining possession of specific property; possession of specific property can seldom be shared, and mere contribution by one party to another's successful efforts to obtain possession earns no compensation.

Would-be finders are encouraged by these rules to act secretly, and to hide their recoveries, in order to avoid claims of prior owners or of other would-be finders that could entirely deprive them of the property.

Some jurisdictions have modified the common law of finds to require would-be finders to give notice of recovery to possible owners or to the government, and courts have tried, although not always with success, to find or to imply a promise by the adjudicated owner to compensate the would-be finder for his services. *See* R. Brown, *supra*, § 15, at 29–32. But these modifications of the common law rules merely underscore the harsh, primitive, and inflexible nature of the law of finds. Professors Gilmore and Black have aptly described the law:

> On land the person who rushes in to save another's property from danger is an officious intermeddler, the volunteer whom even equity will not aid. He has no right to a reward although he may incur liability if he damages the property in the course of saving it. The person who saves life on land is similarly treated, except that he may count on a paragraph in the court's opinion paying tribute to his good character.

G. Gilmore & C. Black, *The Law of Admiralty* 532 (2d ed. 1975).

Admiralty favors the law of salvage over the law of finds because salvage law's aims, assumptions, and rules are more consonant with the needs of marine activity and because salvage law encourages less competitive and secretive forms of conduct than finds law. The primary concern of salvage law is the preservation of property on oceans and waterways. Salvage law specifies the circumstances under which a party may be said to have acquired, not title, but the right to take possession of property (e. g., vessels, equipment, and cargo) for the purpose of saving it from destruction, damage, or loss, and to retain it until proper compensation has been paid.

Salvage law assumes that the property being salved is owned by another, and thus that it has not been abandoned. Admiralty courts have adhered to the traditional and realistic premise that property previously owned but lost at sea has been taken involuntarily out of the owner's possession and

control by the forces of nature at work in oceans and waterways; in fact, property may not be "salvaged" under admiralty law unless it is in some form of peril. *See* 3A M. Norris, *supra*, at 5–1 to 5–3. As Norris suggests, "an endangered vessel abandoned by her crew by reason of their safety; a vessel blown adrift from her moorings and fetched up on rocks or shoals; or an appliance, gear or appurtenance of a vessel lost in navigable waters within a harbor"—each of which is a common object of salvage operations—cannot readily be said to have been abandoned. *Id.* at 11–15. "When articles are lost at sea the title of the owner in them remains, even if they are found floating on the surface or after being cast upon the shore." *Id.* at 11–1 (footnote omitted). Even sunken cargo and vessels are in general deemed "abandoned" in admiralty only in the sense that the owner has lost the power to prevent salvage; a finding that title to such property has been lost requires strong proof, such as the owner's express declaration abandoning title. *E. g., Brady v. The S.S. African Queen, supra; Eads v. Brazelton, supra; cf. Peabody v. Proceeds of Twenty-Eight Bags of Cotton,* 19 F.Cas. 39, 39–40 (D.Mass.1829) (No. 10,-869) (property is "derelict" if it is "deserted or abandoned upon the seas, whether it arose from accident or necessity or voluntary dereliction"). Just as the owner may rebut the assumption in the law of finds that title has been abandoned, the salvor may rebut the assumption of salvage law that title has not been abandoned. Salvage law accommodates this possibility by granting the salvor only a superior right of possession, and not title, until a court has passed on title and the salvage fee. *The Akaba,* 54 F. 197 (4th Cir. 1893).

Salvage law requires that to be a salvor a party must have the intention and capacity to save the property involved, but the party need not have the intention to acquire it. Furthermore, although the law of salvage, like the law of finds, requires a salvor to establish possession over property before obtaining the right to exclude others, "possession" means something less in salvage law than in finds law. In the salvage context, only the right to compensation for service, not the right to title, usually results; "possession" is therefore more readily found than under the law of finds. No doubt the rule requiring possession and an intent to salve encourages aggressive activity by would-be salvors; salvage law appeals to the "personal interests of the individual as a motive of action." *Seven Coal Barges,* 21 F.Cas. 1096, 1097–98 (C.C.Ind.1870) (No. 12,677). But the would-be salvor need not exhibit a will to own, but only a will to preserve and to be rewarded, and the would-be salvor's acts need not establish the most secure possession possible in the circumstances, but only a possession secure enough to warrant finding a right to perform service and a right to a just reward. Moreover, unlike the would-be finder, who is either a keeper or a loser, the salvor receives a payment, depending on the value of the service rendered, that may go beyond *quantum meruit.* Admiralty's equitable power to make an award for salvage—recognized since ancient times in maritime civilizations—is a corollary to the assumption of nonabandonment and has been applied irrespective of the owner's express refusal to accept such service. *See The John Gilpin,* 13 F.Cas. 675, 676 (S.D.N.Y.1845) (No. 7,345) (citing cases); K. McGuffie, *Kennedy's Civil Salvage* 9–13 (4th ed. 1958).

Although success is essential to obtain a salvage reward, *Crawford v. West India Carriers, Inc.,* 337 F.Supp. 262, 268 (S.D.Fla.1971), a would-be salvor who does not himself save the property involved will be paid for any service rendered that helps another salvor preserve the property. *Legnos v. M/V Olga Jacob,* 498 F.2d 666, 1974 A.M.C. 2328, *rehearing en banc denied,* 503 F.2d 667 (5th Cir. 1974); 3A M. Norris, *supra,* at 18–1 to 18–13. A salvor will frequently seek the right to salvage without interference, and the law will grant such an exclusive right if the first salvor's effort is ongoing and has a "fair prospect of success." *The Edilio,* 246 F. 470, 474 (E.D. N.C.1917); *The John Gilpin, supra,* 13 F.Cas. at 676. But because salvage rewards may be shared, salvors are free to work

together to recover the same property, confident that the law will reward each participant in proportion to his contribution. *The Blackwall*, 77 U.S. (10 Wall.) 1, 12, 19 L.Ed. 870 (1869); *The Annie Lord*, 251 F. 157 (D.Mass.1917). Indeed, salvors have been held "bound to accept the assistance offered them, if it was necessary to the ultimate success of the enterprise, or would hasten that result in any material degree." *The Ida L. Howard*, 12 F.Cas. 1163, 1165–66 (D.Mass.1865) (No. 6,999). Furthermore, because the right to salvage depends on the utility of the service offered, and is not necessarily exclusive or permanent, admiralty courts have more freedom to protect salvage operations that are substantial and promising though not yet successful than common-law courts have in applying the law of finds to bona fide but unaccomplished searches. Admiralty courts may be more flexible in determining whether a salvor has commenced an operation worthy of protection than common-law courts in deciding which searchers have taken sufficient steps to warrant deeming them finders, and therefore "keepers," of the property involved.

These salvage rules markedly diminish the incentive for salvors to act secretly, to hide their recoveries, or to ward off competition from other would-be salvors. In fact, the salvor is required to give notice of his recovery of property and, unless he reaches an agreement with the owner, to bring the property before an admiralty court. 3A M. Norris, *supra*, at 11–2 to 11–3; *cf. The Alcazar*, 227 F. 633 (E.D.N.C.1915) (improper refusal to permit owner to examine property). His failure to do so constitutes misconduct and jeopardizes his status as salvor and the recovery to which he would otherwise be entitled. Over-aggressiveness may also constitute misconduct, thereby adding a further deterrent against tortious or criminal behavior by would-be salvors. *See The Edilio, supra*, 246 F. at 474 (first salvor may not improperly be displaced); 3A M. Norris, *supra*, at 8–1 to 8–53; *id.* at 1–3 to 1–4 (describing the earliest of American salvage cases, *Kennedy v. 96 Pieces of Sailcloth* (1750)). The rule that a competing salvor is

denied any reward if his participation was unnecessary discourages attempts to take unfair advantage of a first salvor's efforts, even during the first salvor's temporary absence from the site. In short, although salvage law cannot alter human nature, its application enables courts to encourage open, lawful, and cooperative conduct, all in the cause of preserving property (and life).

■ Substantial policy considerations therefore support admiralty's preference for applying salvage law to maritime searches for property previously owned. Those considerations apply with maximum force in a case such as this, in which ownership of the *Harold* silver has not been determined, and in which parties who intend to claim ownership have been identified. This case differs therefore from the few cases in which admiralty courts would properly apply the law of finds, because the prior owner expressly abandoned the property, or no prior owner seemed likely to come forward, or a court had definitively adjudicated ownership prior to determining any right to salvage.

It is also significant for the decision to apply the law of salvage in this case that neither of the parties claiming ownership has sought to press a claim to have any particular group perform the salvage operation. Although the Underwriters made a contract with the American Group to perform the salvage, neither they nor American has pressed that agreement as a basis for exclusive salvage rights. Had a purported owner claimed the right to choose its salvor, a determination of ownership might have been necessary at this preliminary stage. If, in making that determination, the property were found to have been abandoned, the Court might then have been required to apply the law of finds and thereby to deny to all three competing groups any exclusive right to search for the silver. Those complications are not present, however, so admiralty's ordinary preference for salvage-law principles prevails.

C. *The Circumstances Justify Designating Salvors*

None of the competing groups has recovered any silver; indeed, none has convinc-

ingly identified or located any silver. Nevertheless, salvage law principles are sufficiently flexible to justify designating two of the parties salvors in this case.

The *Harold* cargo may be stolen by treasure hunters and is therefore sufficiently at risk to be a fit subject for salvage. *See Platoro Ltd., Inc. v. Unidentified Remains of a Vessel*, 614 F.2d 1051, 1055, *rehearing en banc denied*, 617 F.2d 295 (5th Cir. 1980). The groups competing for the right to salvage the cargo all include individuals with sufficient background, experience, and credibility to warrant some degree of confidence in their capacity to recover the cargo sought; and all are volunteers. Each party has developed a plan for recovering the cargo that seems to have reasonable prospects for success. The three competing groups are the only would-be salvors to have come forward, and the two purported owners have accepted all three groups as adequate salvors. Finally, two of the groups have expended considerable resources and energy in attempting to implement their plans, and may already have contributed services that could ultimately lead to a salvage award. *See The Sabine*, 101 U.S. (11 Otto) 384, 390, 25 L.Ed. 982 (1879) (services must contribute to success to warrant reward).

III. *Efforts of the Competing Parties*

The governing salvage standards require an evaluation of the efforts and accomplishments of each competing group of divers. That evaluation must examine when each group's effort began, when each group undertook tangible activity to recover the cargo, how skilled and worthy each group appears to be, how much each group has invested in capital and labor, and how likely each group is to succeed.

A. *The Ocean Group*

The Ocean Group's efforts to recover the *Harold's* cargo can be traced to July 1971, when James G. Wehner began to research the facts surrounding the 1903 incident to determine the location of the cargo. Wehner made intermittent visits to the area between 1972 and 1979. Around September 1979, it became apparent to Wehner that the project would require more equipment, funds, and diving expertise than he himself had, and he formed a venture with Ocean Salvage, Inc., to search for the silver. The leader of the venture, Robert Hooper, is an experienced, hard-hat diver, that is, a diver who uses equipment (including a full environmental suit) that permits him to remain under water, receiving air from, and constantly communicating with, his team on the surface. Tr. 14–15, 183. Research proceeded under Hooper's leadership, and some surveying, diving, and jetting operations were undertaken on May 10, 1980, and between July 1980 and September 1980. At that point, Hooper realized that the search required even more sophisticated equipment than Ocean Salvage was then using.

In September 1980, the Ocean Group obtained additional financing and purchased a sub-bottom profiler, which it used to locate a relatively deep area on Story Flats approximately 100 feet by 300 feet in diameter. Hooper and his Group consider that discovery important, for they believe the area to be the original excavation made in 1903 by Baxter Wrecking Company in recovering 85% of the *Harold* cargo. Hooper and the Ocean Group believe that the unrecovered silver is located in that area, which they call the original excavation (also called the "Hooper site"). Tr. 821–22. They seek to dive and dredge only in the area shown in Exhibit A to the Ocean Group's Proposed Findings, which consists of the Hooper site together with a buffer zone they claim is necessary.

Beginning in November 1980, the Ocean Group explored the site with several craft, including a very large vessel called the *Amberjack V* and two barge-and-crane rigs. In the month of December 1980 the Ocean Group spent $40,000 in its effort. Ocean Ex. 4, Exhibit 18. It employed a crew of up to fifteen persons, including divers, tenders, a doctor, and a paramedic. Ocean Ex. 6, Exhibit 1, Appendix A at 6. Ocean chartered its first salvage rig from Haines Marine, Inc., from December 1979 to February 1980. In addition to diving from their

boats, the members of the Ocean Group, during December 1980, also used a "blaster," fabricated at a cost of approximately $5,000. (A blaster is a device measuring about six feet by twenty feet that deflects a propeller's wash downward to force bottom material away from the excavation area.) After two weeks of using the blaster, Hooper decided that a crane and bucket would be necessary to dig and sift the overburden at the salvage site, which is as much as thirty-five feet deep. On December 26, 1980, the first crane and barge and mud sifter were brought to the site. The *Amberjack V* left the site on or about January 8, 1981, at which time the blaster was intentionally dropped into the excavation. Meanwhile, work continued with the first barge and crane and a mud sifter.

On February 3, 1981, the Ocean Group concluded that the first barge-and-crane rig was too small to conclude the operation within a reasonable time. A much larger piece of equipment was necessary to remove the overburden efficiently. Therefore, on February 3, 1981, the Ocean Group removed the rig from the site; at the same time, it removed five markers that it had previously placed there.

Between December 1980 and February 1981, the Ocean Group attempted to keep its purpose secret. Tr. 133, 136, 201. The Group's personnel placed markers at the site, for example, not to give notice of their presence, but to aid them in their search. Nevertheless, their purpose was widely known and publicized. *E. g.*, Tr. 383, 394. Between December 11 and 13, 1980, various newspaper articles appeared suggesting strongly that the Ocean Group was searching for the *Harold* silver. The *Amberjack V* is so large a vessel, moreover, that it attracted considerable attention as it remained at Story Flats for a long time. When asked by Coast Guard officials what he was doing, Hooper claimed to be surveying the bottom, but his effort to hide his purpose was unavailing. Coast Guard personnel were not deceived, and the many local people who knew of the *Harold* cargo drew the obvious inferences from the Ocean Group's early activities and their reticence.

The Ocean Group could not, in February 1981, afford to buy or to rent a working dredge of the size Hooper had concluded was necessary for the operation. Hooper learned, however, of machinery not currently in working order that could satisfy his needs, and he arranged with its owner for the right to use it, in exchange for repairing the machinery and for a share in any recovery. When Hooper and the Ocean Group left the area to assemble the equipment they believed necessary, they undoubtedly intended to return to Story Flats. Although they made no public announcement, laid no buoys, erected no signs, and left no markers to advise potential competitors of their site and of their intentions, they did announce their intentions to several friends and supporters in Sewaren, some of whom were informally enlisted to watch the Kill for developments. *See* Tr. 128, 287–94. From February 3, 1981, to June 1981, the Ocean Group engaged in efforts to locate, repair, fabricate, and outfit both the borrowed machinery and other suitable salvage equipment, including a barge and cabin. Hooper and his aides worked long hours, without pay, to construct a piece of machinery worth at least $200,000 (according to uncontradicted testimony) and allegedly capable of dredging the entire excavation site within about thirty days. Tr. 140–41, 151, 247–48. Under those circumstances, the Ocean Group's departure was not an absolute abandonment of its salvage effort, as they were prevented from completing their effort by circumstances beyond their control as well as by the need to make preparations for further, more effective work. *See* 3A M. Norris, *supra*, at 7–12 to 7–17.

On or about June 6, 1981, the Ocean Group returned to its excavation site with the renovated salvage rig, which consisted of a P & H 885B 60-ton crane and a barge owned by Shore Equipment Leasing Corp. Hooper and his associates dropped anchor and prepared to recommence their search. Shortly after arriving, however, they were informed that the United States Coast Guard had designated the area a "safety

zone," and under threat of prosecution they were directed to leave the zone. Hooper and his Group left as directed but sought a hearing on their expulsion; they also requested reconsideration of the safety zone to the extent the zone conferred or purported to confer exclusive rights on American to conduct commercial salvage operations until June 30, 1981. The Coast Guard denied all of the relief requested by the Ocean Group except for permission to enter the safety zone to recover salvage equipment. On June 30, 1981, the Ocean Group appealed the rulings of the Captain of the Port of New York; that appeal is now pending.

### B. *The American Group*

The American Group traces its efforts to recover the *Harold* silver to 1974, when its leader, Colin R. Villines, began researching the subject. Villines became interested in the project and went to the area in February 1979 to view the site. Villines is a professional diver with considerable hard-hat experience, but in January 1979, he was an amateur, living and teaching school in Illinois. By February 1979, he had joined forces with Lawrence Green, a less-experienced amateur, who has subsequently gained experience in hard-hat work.

Villines and Green assert that they dove into the Kill at Story Flats in August 1980. During a single day of scuba diving, they say, they located, with the aid of a metal detector, an object that was under eight or nine feet of mud and that had the size, shape, and texture of an ingot. They allege that, though they "felt" the object, they did not remove it for fear that doing so might prejudice their chances of obtaining the owner's consent to recover the entire cargo. Instead, Villines testified, he dove back into the water, relocated the object, marked it with an underwater buoy, and left. Tr. 550–54. Later, when he and Green allegedly tried to retrieve the object, the marker had disappeared. Villines and Green marked on a map, as the spot at which they allegedly found the object involved, an area well to the north of the site chosen by the Ocean Group, close to a place called Smoking Point.

Although Villines may, in fact, have entered the water and found something metallic in August 1980, the evidence fails to establish any such "find." Villines originally claimed by affidavit that he and Green had "found one ingot of silver which we brought up to the boat to study." He swore in that affidavit that, at the time, they "were convinced that this was one of the missing ingots and accordingly lowered it back into the mud and marked it with an underwater buoy." Ocean Ex. 27, Villines Affidavit at 2 (June 25, 1981). At the trial, Villines asserted that this statement was an honest mistake, included in his affidavit by his attorneys. Conceivably, Villines's story is true, for the mistake alleged is the sort that might well result from the excessive enthusiasm with which an attorney might pursue a case in which he has an interest as a principal. Nevertheless, the story is unconvincing because the error is so flagrant that it seems highly unlikely to have occurred innocently. *See, e. g.,* Tr. 473–74 ("I read this in a hurry and I just don't like some wording on it. On page 2 I want to strike the word 'silver' which follows the words "ingot of'.") Even Villines's revised story is unacceptable. Based on the testimony concerning the hard, muddy bottom in the Kill, as well as the total lack of visibility, it is extremely unlikely that Villines and Green in fact found an ingot under eight feet of mud on their very first day of diving with only scuba gear and a metal detector. Finally, even assuming that an ingot was found and marked, its having been left both indicates a lack of intent to acquire it, as required under the law of finds, and renders the control insufficient under salvage law to deem the entire cargo in Ocean's possession. *Compare Rickard v. Pringle*, 293 F.Supp. 981 (E.D.N.Y. 1968) (extensive efforts expended by first salvor warranted protection against competitor).

After the alleged dive in August 1980, Villines sought financing for further operations and set about to contact the insurance companies who had paid ASARCO for the lost cargo. Villines's efforts led him to the

office of J. Bond Smith, Esq., an attorney whom Villines thought could negotiate for the insurance companies. Villines told Smith in December 1980 that he had found an ingot and explained his theory of where the silver was located. Smith replied that he no longer represented the insurance company involved but that he did represent ASARCO, which Smith told Villines he believed to be the true owner. Villines tried to convince ASARCO to authorize him to act as salvor, but when ASARCO refused to negotiate until Villines brought up one ingot of silver, Villines broke off negotiations and sought once again to contract with the insurance companies. Tr. 562, 692. Villines's effort to reach the Underwriters led to his being referred to his present attorneys, with whom he negotiated agreements in January and February 1981 that authorized him to salvage the cargo on behalf of the Underwriters.

By early December 1980, Villines was well aware that another group was searching for the *Harold* silver. Before his first visit to his present attorneys' office, Villines went to the public launching ramp in Sewaren and saw the *Amberjack V*; he told Green that he believed the vessel was looking for the *Harold* silver. Tr. 557. He and Green allegedly did not fear the competitive effort because they believed that the *Amberjack V*, which was floating over the excavation site, was searching at the wrong place. Tr. 557–58. Furthermore, when Villines visited his present attorney in mid-December 1980, he was shown an article on the *Amberjack V's* search from the *New York Times* of December 12, 1980. Tr. 564. Both Villines and his attorneys were thereafter concerned, not only with finding the cargo, but also with excluding and defending themselves against competing groups.

Villines and his attorneys prepared for the competition to recover the cargo by engaging in on-shore activities for two full months. The attorneys helped Villines apply for pistol permits to the New York City Police Department; they also helped expedite issuance of the permits. Tr. 627. American Divers was incorporated, and a company called Marine Salvage Invest-

ments, Inc., was formed to serve as the vehicle for individual partners at the attorney's firm to invest in American's venture. Then, in late January, Villines's attorneys contacted the Coast Guard to ask what the requirements were for salvage operations in the Kill. Coast Guard personnel met with Villines and his attorneys on January 28, 1981; at that time, the Captain of the Port suggested that a safety zone be established. Villines and his attorneys knew then that the Ocean Group was actually on the water at Story Flats, and at least some Coast Guard personnel also were aware of the Ocean Group's activities and intentions. Nevertheless, Villines and his attorneys accepted the Captain's suggestion, fully realizing that a safety zone would exclude a competitor they knew had been engaged in searching for the silver for at least two months. When the Captain asked Villines to indicate on a chart the general area in which he intended to search, Villines drew a line that covered over a mile of the Kill, from Smoking Point south to the area in which the Ocean Group was diving. Villines concedes that this long line was drawn through areas in which he then had little or no interest, but he explains that the Captain had suggested that he avoid revealing the precise spot at which he intended to dive. Tr. 576.

The Coast Guard established the safety zone during February 1981. American personnel arrived at the area to prepare for diving on February 22, about twenty days after Hooper and the Ocean Group had left. Villines went out on the water on about March 3, 1981. Hener Ex. 4 at 1 (Larry Green log). He and his associates engaged in some exploratory diving from small boats during March, but they soon concluded that the thirty- to forty-foot mud bottom was too deep to penetrate with jetting operations. American personnel had pistols, for which they had permits, and other firearms, including two shotguns and an automatic rifle (an AR–15), for which they had no permits. Tr. 630–31. In late March they obtained a barge and some salvage equipment in exchange for a share in the ven-

ture. At the same time, they ordered from Raytheon a sonar device that was advertised as a fish finder but that they planned to use to profile the bottom. The Raytheon device arrived in early April but did not work satisfactorily until late April or May, when American began its bottom survey. Hener Ex. 4, at 7–8. The American Group apparently stopped its boat at the Ocean Group site on March 4, but it did so only to "check the bottom"; the check found deep mud, and the boat moved to near Smoking Point the very next day. Villines and his aides concentrated their activities at or near the place they claimed they had found a metallic object in August 1980. Tr. 798–99; Hener Ex. 4 at 1–3. That focus was consistent with their theory that the *Harold* silver had fallen in a trail along the Kill, starting off Smoking Point. Tr. 409, 506–08.

On April 10, 1981, American applied for a dredging permit to the New York State Department of Environmental Conservation (DEC). The area covered by the American Group's request was precisely the area it had been interested in all along; the area extended south a relatively short distance from Smoking Point to cover the spot of the alleged August 1980 find. The specified area does not include the Ocean Group site. On the other hand, American's application did reveal its belief that the cargo was scattered along a stretch of the Kill over one mile long. Ocean Ex. 8.

During April 1981, Villines and his Group were almost exclusively engaged in learning to use their newly acquired sonar device. They practiced with the device, throwing metal bars into the Kill and diving to recover them. They claim to have developed the capacity to locate metal bars the size of the lost ingots as black "spikes" on the sonar screen. Tr. 522–23. Yet, though their principal aim from late April until July, as Green testified, was to bring up at least one silver ingot, they were unable to do so. Tr. 731. Furthermore, although Villines and his Group may occasionally have practiced their technique in the Ocean Group's site, they continued to regard the area off Smoking Point as the

site of primary interest. *See* Tr. 749. In fact, on April 27, after several days of sonar scanning and experimentation, Villines sought to modify the Group's dredging permit application. He sought to narrow, rather than to expand, the area in which American proposed to dredge, falsely claiming under oath to have located the cargo in an area some seventeen by twenty-five yards. Tr. 496–97; Ocean Ex. 8. Once again, the area specified was off Smoking Point, in the vicinity of the alleged August 1980 find, and did not include the site sought by the Ocean Group.

During May, the American Group continued primarily to scan and practice its mapping technique. Around the end of May, Villines and his associates became convinced that the "black spikes" they saw on the sonar screen were silver ingots. On June 2, they began diving in earnest off Smoking Point. Hener Ex. 4 at 11. They repeatedly jetted and dove for ingots at that site, but they recovered none. On June 6, the American Group observed the Ocean Group's salvage rig being moved by tug to the excavation site. American immediately notified the Coast Guard, which ordered the Ocean rig out of the area. On June 7, when the Ocean rig left the area, the American Group moved a boat to the excavation site and began to mark it with buoys. While it thereby sought ineffectually to stake a specific claim in that area, *Deklyn v. Davis*, 1 Hopk. Ch. 154 [135] (N.Y.1824), the American Group continued its search activities until at least June 12 in the area off Smoking Point specified by its revised dredging application.

On June 15, the Captain of the Port held a hearing, after which he denied the Ocean Group's application to search within the safety zone, apparently because he believed that he lacked authority to permit a second salvor to operate in the area. On or about June 24, the American Group moved down to the area in which the Ocean Group had been operating. The approval on June 17 of American's revised dredging application enabled American to begin dredging on June 19. But the permit covered only the

area sought in the amendment, and not the area in which Ocean was operating. Nevertheless, American began dredging operations over the Ocean site on June 24. On June 25, DEC ordered American to halt its unauthorized dredging. On June 26, this Court temporarily enjoined all search and salvage operations designed to find and salvage the *Harold* silver.

## C. *The Hener Group*

The Hener Group traces its efforts to recover the *Harold* silver to mid-1980, when one of its members, Michael Mazzei, became interested in searching for the cargo after he read the *Treasure Divers Guide.* The Group consists entirely of amateur divers, who have recovered "a few things" and who have no hard-hat experience. Hener asserts that he telephoned the Coast Guard in January 1981 from a private home to report his intent to dive. The Coast Guard has no record of the call, however, *see* American Ex. 3, and no record of such a long-distance call was submitted to the Court. The Group purchased a metal detector for over $3,000 and leased bottom-profiling equipment. During the weekend of February 20–22, 1981, the Group engaged in some bottom profiling. That activity continued intermittently, but no bottom profile was completed.

The Hener Group has identified certain "hot spots" with its equipment. Hener's searchers used the 1886 Government Chart to find the original channel on the Staten Island side of the Kill. In early March they used an "aqua pulse" (metal detector) and a "flux-state magmometer" to detect (and enable them to disregard) ferrous metals. On March 21, they made their first dive. Tr. 10. They claim to have dived a couple of feet into the mud. They continued to dive, off and on, until about May 22, but their efforts were superficial and inadequate considering the challenge posed. For example, at no time has the Group done any digging or dredging. On May 23, the Group was told by the Coast Guard to leave the area because a safety zone had been established.

The Hener Group's members believe that their equipment now enables them to pinpoint the location of each ingot within one or two feet, and they propose to build a raft and tower, as well as to fabricate large tubes to sink into the bottom sediment. This would enable them, they claim, to cover each ingot with their tube, dredge out the bottom material inside the tube, remove the ingot, and then replace the dredged sediment to the same site. Tr. 55–59. They have not yet obtained or constructed any of the necessary material. They seek to search only in the area between Buoys 14 and 15, an area that does not overlap the Ocean Group's chosen site but that takes in much of Story Flats between the alleged excavation and Smoking Point, thereby conflicting with the area to be searched by the American Group.

## IV. *Application of Salvage Law*

Applying traditional salvage principles to the present situation, an adequate basis exists for finding that two of the competing groups of divers—the Ocean and American Groups—should be deemed salvors. First, both groups have made substantial investments, in time and money (months of work and several hundreds of thousands of dollars), in their attempts to search for and raise the *Harold* cargo. Both efforts therefore reflect a seriousness of purpose and intent consistent with promising responsible salvage activity. The Hener Group, by contrast, has made minimal investments in equipment and time. Its situation, therefore, is strongly similar to that of Bearers and Burchard in *Wiggins v. 1100 Tons, More or Less, of Italian Marble, supra,* 186 F.Supp. at 455. Although the Hener Group searchers appear to be sincerely motivated, they have not made the commitments necessary to give them the same equitable claim that the American and Ocean Groups possess.

Both the Ocean and American Groups have also taken tangible steps toward recovering the cargo. Both have identified specific areas of interest. Both have made numerous preliminary dives and have engaged in extensive study and investigation.

Both have obtained equipment necessary for the final stage of recovery, and both have placed their equipment over the areas in which they intend to commence operations.

That the Ocean Group was forced by the Coast Guard to move its dredging machinery from its chosen site is no more significant than that the American Group was forced to cease its work by an order of this Court. The Coast Guard's order to the Ocean Group was secured by the efforts of Ocean's competitor, American. The order did not rest, as the Coast Guard concedes, on any determination that American has superior rights to salvage at the location selected by the Ocean Group; indeed, the Ocean Group actually entered the area before the American Group had commenced any significant activity at that spot. *Cf. Brady v. The S.S. African Queen, supra,* 179 F.Supp. at 323–24 (would-be salvor's published intentions to salvage were mere efforts devised to discourage other salvors and, in the absence of successful salvage, insignificant). Indeed, the statute and regulations that authorize the establishment of safety zones, 33 U.S.C. § 1221 (1976); 33 C.F.R. § 165 (1980), do not even purport to grant the Coast Guard authority to determine exclusive salvage rights.

The American Group failed to meet its burden of proving that the conduct and behavior of Ocean Group personnel in any respect departed from acceptable norms. *See The Boston,* 3 F.Cas. 932, 939 (C.C.D. Mass.1833) (No. 1,673) (Story, J.) (charge of misconduct by salvor must be proved beyond a reasonable doubt). The American Group's efforts to show that the Ocean Group has either threatened or intimidated it were unconvincing. If American's efforts in that regard did anything, they raised substantial doubts about American's own worthiness to salvage. American not only failed to show that Ocean had threatened its personnel with weapons; it offered no proof that Ocean Group personnel even had any weapons. That American personnel saw, as they testified, what looked like a barrel of a gun in an Ocean Group boat was, in all likelihood, merely a reflection of

their paranoia, perhaps triggered by feelings of guilt due to their having schemed to displace Ocean's earlier salvage effort. Unlike the Ocean Group, the American Group not only had weapons, but some of the weapons were unlicensed. Although the American personnel knew, at least after December 1980, that permits were required for weapons, and though they applied for and obtained some permits, they nevertheless went out on the water with at least three weapons that were not registered with the police. One of these (the AR–15) is a semi-automatic combat rifle capable of stopping a charge by several individuals. The Ocean Group personnel who testified appeared older, more mature, and far less inclined to commit violence than the American Group personnel who testified. Although the Court was favorably impressed with Mr. Villines, the American Group leader, particularly with his apparent competence and energy, he and his Group seem younger, stronger, and more fearsome than Ocean Group personnel.

Ocean Group personnel initially did not know of the obligation to secure dredging permits. Once advised of that obligation, they have proceeded to obtain the necessary permits, meanwhile discontinuing all dredging. By contrast, the American Group knew when it began operations of the obligation to obtain dredging permits for specific areas. Nevertheless, American personnel commenced dredging in the excavation area without applying for a permit to dredge there, asserting that they understood their permit to extend to that place. In fact, their permit was approved only for a precisely defined area that does not include the area in which they were dredging; moreover, the permit was issued on the basis of American's false statement that the cargo had been found.

The Ocean Group has been secretive about its purposes all along, and that secrecy might be considered a ground for believing Ocean less likely than American to comply with the requirement that all silver recovered should be placed on deposit with the Court. But the Ocean Group had a

perfectly legitimate fear of being displaced on the water. Based on the Court's exposure to Ocean Group personnel, and particularly to Hooper, very little doubt exists that the Ocean Group will cooperate in submitting all recovered cargo to the Court for its disposition. Finally, American may not tenably contend that the Ocean Group should be estopped because of its silence, for American in no respect relied on an explicit or implicit representation by Ocean. *Compare Allen & Co. v. Occidental Petroleum Corp.*, 382 F.Supp. 1052 (S.D.N.Y.1974).

The decision to permit both Ocean and American to commence salvage operations on or near Story Flats is premised on the capacity of both parties actually to recover the silver. Because neither party has yet recovered a single "pig" of cargo, it is proper that both parties be placed under a requirement to perform. Both Ocean and American asserted at the hearing that in a short period—perhaps within thirty days of commencing dredging operations—they would be able to demonstrate their capacity to recover the cargo. If either group is unable to demonstrate its capacity to recover the silver, then it should be deemed a mere searcher rather than a salvor and deprived of the opportunity to control an exclusive area for purposes of salvage. Therefore, the Court has required in its order, as a condition of having granted authority to Ocean and American to salvage at certain places on the Arthur Kill, that each party file with the Court, on a weekly basis, a report of its efforts and achievements during the preceding week. The Court will examine these reports and issue such orders as may be appropriate. In this connection, the Court is aware of the theory of recovery advanced by the Hener Group. If either of the authorized groups employs that theory, the Hener Group will be entitled to credit for the idea. If either American or Ocean is found unable to act effectively as a salvor, then the Hener Group's application to dive will be reconsidered; other applications may also be considered. In addition, though American and Ocean have priority for their salvage operations, the purported owners of the silver may request permission to contract with alternative groups in the event that the currently authorized groups fail to demonstrate their capacity to recover the cargo. Finally, if one of the authorized groups fails in its efforts while the other succeeds, the successful group may well be in a position to act, pursuant to a further order of this Court, as salvor of the entire cargo. (Nothing, of course, would preclude American and Ocean from combining efforts to minimize risk and expense.)

A remaining issue concerns what areas are being awarded each of the competing salvors. The central core of the Ocean Group's area is undisputed, and indisputably Ocean's. When Ocean left the claimed excavation area to obtain better equipment, it had the intention to return, and it did return, to that area to commence dredging operations. At the time Ocean returned, on June 6, 1981, American had made no significant effort to salvage in the area; indeed, American manifested no tangible interest in it. The only action that the American Group had taken with respect to that area was to obtain a Coast Guard order of exclusion, without hearing or actual notice to the competing Ocean Group, that American claims gave it exclusive salvage rights. Tr. 679, 859–60. The Coast Guard established the safety zone, however, solely to protect the safety of divers, and the Coast Guard agrees that establishment of the zone could not in any respect increase the salvage rights of any party. Tr. 570, 854–55, 878–79.

Given that the American Group is primarily interested in the area near Smoking Flats, as shown by its dredging application and by its conduct, a buffer zone can be established that does not impinge on either of the areas actively investigated by American or Ocean. A buffer zone of 300 feet from the edge of the excavation site seems appropriate at this time. The dredging equipment involved is itself approximately 100 feet long. Furthermore, there is a demonstrated need to keep these parties apart. The American Group has shown a propensity to carry weapons and to act ag-

gressively, and even though this Court has taken the precaution of prohibiting all weapons except those that may be carried by professional protection service personnel, it seems necessary to separate American from Ocean by at least 300 feet. Although the Coast Guard and the New York City Police Department both patrol the area involved, their resources are so limited that they could not guarantee protection to anyone in an open race for the cargo. Tr. 303–05. This is not to say that the Ocean Group should be permitted to dredge inside the buffer zone (outside the claimed excavation area) until it has demonstrated its capacity to recover silver from the excavation area itself. Hooper impressively asserted that his Group "has no interest in any other spot [than the excavation] and, if the 'HAROLD's' cargo is not there, he will abandon rather than move on to another place in the Kill." Post-Hearing Memorandum of Ocean Salvage, Inc. and Assoc. 31; Tr. 157. Therefore, no dredging by the Ocean Group outside the excavation area and within the buffer zone shall occur until this Court finds good cause to permit such dredging.

Nothing in the record justifies any further limitation on the area designated for American Group activity. Although the American Group has expressed greatest interest in a limited zone near Smoking Point, it has recently traced what it calls "black spikes" down to the Story Flats region. Also, American made clear to the Coast Guard and to the DEC its intention to expand its area of search after completing its effort in the area it had chosen for its initial activities. Therefore, it seems equitable to award to the American Group as a permissible area of activity the entire area not covered by the Ocean Group's operation, with the buffer zone deemed for the present a neutral zone. Of course, the American Group's right to salvage, like that of the Ocean Group, will depend on its having successfully demonstrated the capacity to salvage effectively.

Based on the findings and conclusions in the foregoing opinion, an order was entered by this Court permitting the Ocean and American Groups to commence salvage operations after obtaining all the requisite permits and approvals from the Coast Guard, the DEC, and any other regulatory agencies from whom permission might be required. That order will remain in effect until issuance of a further order of this Court and should be read in light of the findings and conclusions stated above.

SO ORDERED.